UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| AFFILIATED FM INSURANCE COMPANY,<br><br>            Plaintiff,<br><br>    v.<br><br>LTK CONSULTING SERVICES, INC.,<br><br>            Defendant. | CASE NO. C06-1750JLR<br><br>ORDER |

## I. INTRODUCTION

This matter comes before the court on a motion for summary judgment from Defendant LTK Consulting Services, Inc. ("LTK Consulting") (Dkt. # 16). The court has considered the papers filed in connection with the motion and has heard oral argument. For the reasons stated below, the court GRANTS LTK Consulting's motion.

## II. BACKGROUND

The material facts related to this motion are not in dispute. In 1962, the City of Seattle hosted the World's Fair. The Seattle Monorail, an elevated transportation system linking Seattle Center to Downtown, stands prominent among the famous landmarks built for the Fair. In 1994, the City of Seattle ("the City") entered into a Monorail Concession

ORDER – 1

Agreement ("the Agreement") with Seattle Monorail Services Joint Venture ("the Concessionaire") to operate the Monorail System.[1]  Honig Decl., Ex. 1 (Agreement).  The Agreement grants to the Concessionaire:

> [T]he concession right and privilege to maintain and exclusively operate the Monorail System including the facilities, personal property and equipment, together with the right to use and occupy the areas . . . .

Agreement at ¶ III.A.  The Agreement imposes on the Concessionaire certain responsibilities for maintenance and repair.  Id. at ¶ XI.A-N.  The maintenance obligation, however, is not exclusive.  The City has the right to access the Monorail System to make inspections, repairs, improvements, and alterations.  Id. at ¶ XIX.  The Agreement further requires the Concessionaire to secure and maintain insurance to cover potential property damage and bodily injury.  Id. at ¶ XVII.  The contracting parties agreed that the Concessionaire would name the City as the loss payee under the insurance policy.  Id.  They also agreed to apply all losses payable under the policy to the repair or restoration of the Monorail System.  Id.   At all times relevant to this dispute, the Concessionaire maintained insurance coverage with Plaintiff Affiliated FM Insurance Company ("AFM Insurance").

In 1999, under a separate contract, the City hired LTK Consulting to identify and repair problems with the Monorail's trains.  Lawlor Decl., Ex. 1 at ¶ A3.  Neither the Concessionaire nor its insurer, AFM Insurance, was a party to the contract.  LTK completed its work sometime in 2002.

On May 31, 2004, the Monorail's Blue Train caught fire as it was leaving the Seattle Center station, resulting in damage to both the Blue and Red Trains and an

---

[1] Consistent with the parties' briefing, this court refers to the "Monorail System" as it is described in section III of the Agreement.  Generally, the System consists of the Red and Blue Trains, the concrete guideway on which the trains run, the areas of the Westlake Center station that the City occupies pursuant to an easement, and the Seattle Center station.  Agreement ¶ III.

ORDER – 2

interruption of service. The parties generally agree that the train's driveshift disintegrated, impacting a positive-current "collector shoe," causing an electrical fault that, in turn, ignited a fire. The parties strongly disagree about whether engineering advice that LTK Consulting provided to the City was a proximate cause of the fire. Solely for purposes of this motion, LTK Consulting concedes that the changes it recommended to the City sometime between 1999 and 2002, resulted in a condition that permitted the electrical fault to occur when the driveshaft disintegrated.

Pursuant to the Concessionaire's policy (and upon settlement of a coverage dispute), AFM Insurance paid $3,267,861 for damages to the Monorail System resulting from the fire. Compl. ¶ 5.1. On November 7, 2006, AFM Insurance filed this tort action against LTK Consulting in King County Superior Court, alleging that LTK Consulting's negligent engineering advice caused the fire. Id. at ¶¶ 3.1.-3.3. LTK Consulting removed the action to this court on December 5, 2006 and now moves for summary judgment.

### III.  DISCUSSION

**A.    Legal Standard**

Summary judgment is appropriate if the evidence, when viewed in the light most favorable to the non-moving party, demonstrates there is no genuine issue of material fact. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Galen v. County of Los Angeles, 477 F.3d 652, 658 (9th Cir. 2007). The moving party bears the initial burden of showing there is no material factual dispute and he or she is entitled to prevail as a matter of law. Celotex, 477 U.S. at 323. The moving party can satisfy this burden in two ways: (1) by producing evidence that negates an essential element of the non-moving party's case, or (2) after suitable discovery, by showing that the non-moving party does not have enough evidence of an essential element to carry its burden of persuasion at trial. Id. at 322-23; see also Nissan Fire & Marine Ins. Co., Ltd., v. Fritz

ORDER – 3

Cos., Inc., 210 F.3d 1099, 1106 (9th Cir. 2000). If the moving party meets its burden, the opposing party must present evidence to support its claim or defense. Cline v. Indust. Maint. Eng'g. & Contracting Co., 200 F.3d 1223, 1229 (9th Cir. 2000). For purely legal questions, summary judgment is appropriate without deference to the non-moving party.

**B.     The Concessionaire's Interest in the Monorail System**

The central dispute in this case concerns the type of interest the Concessionaire (and therefore, AFM Insurance[2]) acquired when it took over operation of the Monorail System. The parties generally agree that damages other than injury to one's *own* property or person are economic losses, and ordinarily outside the bounds of a tort action. Berschauer/Phillips Constr. Co. v. Seattle Sch. Dist. No. 1, 881 P.2d 986, 992-93 (Wash. 1994) (holding that purely economic losses are not recoverable in tort); see also Robins Dry Dock & Repair Co. v. Flint, 275 U.S. 303, 308-09 (1927) (holding that claimant may not recover in tort for injury to another's property). With this principle in mind, AFM Insurance urges the court to construe the Agreement as granting the Concessionaire a leasehold (i.e., property) interest in the Monorail trains, such that the fire damage to the trains gives rise to a tort action against LTK Consulting for any proximately caused harm. LTK Consulting argues that the Concessionaire never "owned" the trains because it acquired a mere license to operate the Monorail System; and thus any injury the Concessionaire suffered was necessarily economic and not recoverable in tort.

Sitting in diversity, the court applies the substantive law of the forum state to the parties' dispute. Freund v. Nycomed Amersham, 347 F.3d 752, 761 (9th Cir. 2003)

---

[2] As a subrogee, AFM Insurance stands in the Concessionaire's shoes and acquires whatever rights the Concessionaire holds. Western Wash. Corp. of Seventh-Day Adventists v. Ferrellgas, Inc., 7 P.3d 861 (Wash. Ct. App. 2000). Thus, AFM Insurance's ability to recover in tort against LTK Consulting is coextensive with the Concessionaire's. To avoid confusion, the court refers simply to the Concessionaire's interests throughout this order.

ORDER – 4

(citation omitted).  Under Washington law, a lease is created if a tenant is granted exclusive possession or control of a parcel of land or a portion thereof.  <u>McKennon v. Anderson</u>, 298 P.2d 492, 494-95 (Wash. 1956); <u>Regan v. City of Seattle</u>, 458 P.2d 12, 14 (Wash. 1969) ("The critical question in determining the existence of this [landlord/tenant] relationship is whether exclusive control of the premises has passed to the tenant.").  A license, on the other hand, grants only the authority to do a particular act upon the owner's land, and is generally non-transferrable.  <u>Barnett v. Lincoln</u>, 299 P. 392, 394 (Wash. 1931).  "In determining whether a written instrument constitutes a lease or a license, the court must consider it in its entirety, together with the circumstances under which it was made . . . and the intention of the parties."  <u>Conaway v. Time Oil Co.</u>, 210 P.2d 1012, 1017 (Wash. 1949).

       The court concludes that AFM Insurance cannot recover in tort against LTK Consulting because the Concessionaire did not exercise the requisite degree of possession and control over the trains sufficient to demonstrate "ownership."  Although not a perfect analogue, the relationship between the Concessionaire and the City under the Agreement is closer to that of licensor/licensee, than landlord/tenant.  Read in its entirety, the overall purpose of the Agreement is to grant authority to the Concessionaire to enter onto the premises in order to perform the particular act of operating the City's transportation system.  The Agreement confers to the Concessionaire the right and privilege to "maintain" and "exclusively operate" the Monorail System and the right to "use and occupy" certain components of the transportation system, Agreement ¶ III.A; it does not convey exclusive control or possession over the premises.  Indeed, the right to "operate" is the only function to which the parties assign the qualifier "exclusively."  <u>Id.</u>  Further, similar to the rights afforded under a license, the Concessionaire's rights and responsibilities under the Agreement are non-transferrable.  <u>Id.</u> at ¶ XX (providing that

ORDER – 5

the Concessionaire cannot "subcontract, assign or otherwise transfer . . . its responsibilities").

Perhaps most significant, the Agreement provides that the Concessionaire does not have the power to exclude the City from the Monorail System; rather, the City retains the right to access the System to inspect, repair, alter, and make any improvements it deems necessary, without any particular notice. Id. at ¶ XIX.A. AFM Insurance does not cite a single instance in which the Agreement mentions anything "exclusive" about the Concessionaire's right to control or possess the premises. Indeed, the City's right to access the Monorail System remains paramount. Id. at ¶ XIX.D ("Any entry to the Monorail System obtained by the City by and of said means, or otherwise, shall not under any circumstances be construed or deemed to be a forcible or unlawful entry into, or a detainer of, the Monorail System . . . ."). Notably, the Agreement specifies that the City possesses a "key" to unlock the doors to the Monorail System. Id. at ¶ XIX.D. What is more, there is no question that the City has the right to contract with *other* entities, such as LTK Consulting, to use and occupy the Monorail System in order to inspect and make repairs. To be sure, the Agreement makes the Monorail System "available" to the Concessionaire; however, it leaves intact the City's right to "adjust" the availability when necessary to serve the interests of the public. Id. ¶ III.C (allowing the City to "adjust the exact area in which any part of such System's facilities or equipment is located, activity is undertaken, or service is provided.").

Under the terms of the Agreement, the Concessionaire could not have exercised the requisite degree of exclusive control or possession over the premises sufficient to establish a property interest in the trains. Indeed, the undisputed facts show that at least one contractor, LTK Consulting, occupied the premises for a significant duration in order to conduct inspections and make repairs. Absent evidence that the Concessionaire

ORDER – 6

exercised exclusive possession or control over the trains, the court concludes that the Concessionaire did not suffer an injury to *its* property as a result of the fire. Rather, the Concessionaire's injury in this case is strictly economic – i.e., business interruption and the cost of repairing the damaged trains – and therefore outside the bounds of tort recovery. See Berschauer/Phillips, 881 P.2d at 992. Indeed, the responsibility for repairing damages and insuring a broad range of potential losses is a subject over which the City and the Concessionaire expressly bargained. See Agreement ¶ XVII.A. That the Concessionaire agreed to maintain an insurance policy to cover such losses is a subject that the court leaves to the contracting parties. See Berschauer/Phillips, 881 P.2d at 992 (upholding the economic loss doctrine to "ensure that the allocation of risk and the determination of potential future liability is based on what the parties bargained for in the contract").

**C.    Exceptions to the Economic Loss Doctrine**

Lastly, AFM Insurance contends that the court should apply a "risk of harm" analysis borrowed from products liability law and conclude that the injury in this case is not purely economic because it is the type of harm typically recoverable in tort. Opp'n at 8 (citing Touchet Valley Grain Growers, Inc. v. Opp & Seibold Gen. Constr., Inc., 831 P.2d 724, 733-34 (1992) (describing "sudden and dangerous" test and "evaluative approach" used to determine whether damages are economic)). Even accepting AFM Insurance's premise that products liability law applies in this context, AFM Insurance cannot avoid the economic loss doctrine because, as explained above, it cannot show that the Concessionaire suffered an injury to *its* property. The cases AFM cites, including Touchet, do nothing to alter the general principle that a claimant cannot sue in tort for

ORDER – 7

damages resulting from injury to another's property.  Cf. Robins Dry Dock, 275 U.S. at 308-09.[3]

## IV.  CONCLUSION

For the reasons stated above, the court GRANTS LTK Consulting's motion for summary judgment (Dkt. # 16) and directs the clerk to enter judgment consistent with this order.

Dated this 24th day of July, 2007.

JAMES L. ROBART
United States District Judge

---

[3] Unlike here, there was no question that the claimant in Touchet owned the defective product in question.  831 P.2d at 725 ("This case involves questions of liability following the structural failure of a grain-storage building *owned* by the appellant, a farmers' cooperative.") (emphasis added).

ORDER – 8