UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| AFFILIATED FM INSURANCE CO., | CASE NO. C06-1750JLR |
| Plaintiff, | ORDER GRANTING MOTION FOR SUMMARY JUDGMENT |
| v. | |
| LTK CONSULTING SERVICES, INC., | |
| Defendant. | |

## I. INTRODUCTION

Before the court is Defendant LTK Consulting Services, Inc.'s ("LTK") motion for summary judgment (Dkt. # 80). The court has reviewed the motion, all submissions filed in support and opposition thereto, and the applicable law. Being fully advised, the

ORDER- 1

court GRANTS the motion and dismisses Plaintiff Affiliated FM Insurance Co.'s ("AFM") complaint as barred by the applicable statute of limitations.[1]

## II.  BACKGROUND

This action arises out of a fire that occurred on May 31, 2004 and damaged the Blue and Red Trains of the Seattle Monorail System ("SMS"). (*See* Not. of Rem. (Dkt. # 1) at 7 (Compl. ¶¶ 1.1, 3.2).)  AFM paid SMS $3,267,861.00 for damages resulting from the fire. (*Id.* ¶ 5.1.)  AFM brings this action as the equitable and contractual subrogee of SMS against LTK regarding engineering services that LTK allegedly performed negligently with respect to the electrical grounding system of the Monorail. (*Id.*)

The original 1961 design of the Monorail employed a "floating" grounding system, which is a system in which the ground is not actually connected to the earth or another circuit ground. (Way Decl. (Dkt. # 95) ¶¶ 3, 6.)  Because the car bodies of the Monorail were "floating" or electrically isolated, the metal car bodies did not carry current. (*Id.* ¶ 6.)  The Monorail operated for approximately 27 years with a floating grounding system without a major electrical fault incident. (*Id.* ¶ 7.)

---

[1] Neither party has requested oral argument pursuant to the Local Rules of the Western District of Washington.  *See* Local Rule W.D. Wash. CR 7(b)(4).  The general rule is that the court may not deny a request for oral argument made by a party opposing a motion for summary judgment unless the motion is denied.  *Dredge Corp. v. Penny*, 338 F.2d 456, 462 (9th Cir. 1964). Federal Rule of Civil Procedure 56, however, does not require a hearing where the opposing party does not request it.  *See, e.g., Demarest v. United States*, 718 F.2d 964, 968 (9th Cir. 1983).  The court therefore determines that AFM's motion is appropriate for decision without oral argument.

AFM alleges that the City of Seattle contracted with LTK in 1997 to provide engineering services related to the SMS. (*See* 3/30/12 Wahtola Decl. (Dkt. # 52) ¶ 25 & Ex. 5 (AFM's Ans. to Int. No. 4).) AFM further alleges that in 1998, during the course of this project, LTK redesigned the SMS grounding system from a floating to a "body ground to negative rail" grounding system, also known as a "grounded" or "bonded" grounding system. (*See id.* ¶ 25 & Ex. 5; Way Decl. ¶ 7(c).) According to AFM, these design changes created, for the first time in the history of the Monorail, a bonded grounding system, and that this change introduced a substantial risk of fire in the event of a mechanical failure. (Way Decl. ¶ 7.) LTK denies all of these allegations concerning the 1997 contract, but for purposes of the present motion for summary judgment only, the court assumes that these allegations are true.

Following the alleged change to the grounding system during the 1997/1998 time period, Mr. Glenn Barney, the maintenance manager for SMS, became aware that SMS personnel had begun to experience electrical shocks while working on the Monorail and that there had been several instances of electrical "arcing" between the bodies of Monorail vehicles and the station. (4/20/12 Wahtola Decl. (Dkt. # 76) Ex. 1 (4/10/12 Barney Dep.) at 80:6 – 82:25.) On June 29, 2001, the Blue Train lost power after experiencing an incident of electrical "arcing." (*Id.* at 91:4 – 93:5.) In addition, the Blue Train suffered property damage in the form a one- inch by three-inch hole that was burned through the body of the car. (*Id.* at 90:21 – 91:10; 91:24 – 92:9.) Mr. Barney testified that the June 29, 2001, incident was not the only incident of this type. (*Id.* at 92:6-13.) Indeed, the June 29, 2001 electrical "arcing" incident was the second such

incident in two years. (*Id.*) SMS was required to pay for repairs to the Monorail trains for the property damage sustained as a result of the recurrent electrical "arcing." (*See id.* at 92:14 – 93:5.)

Shortly following the June 29, 2001, incident, Mr. Barney wrote an incident investigation report. (*Id.* at 90:7-91:19.) In his report, Mr. Barney identified, as a contributing factor to the incident, the fact that the electrical grounding system of the SMS had been altered at some point in the past from a floating to a bonded system. (*See id.* at 93:6-25.) At this time, however, Mr. Barney apparently did not know that LTK had allegedly altered the Monorail's grounding system from a floating to a bonded system or that this alteration had initially occurred in the 1997/1998 time frame. (*See* Way Decl. ¶ 12.)

In October 2000, the City of Seattle contracted with LTK to survey the condition of the wiring throughout the Monorail. (*See* 5/1/12 Wahtola Decl. (Dkt. # 81) Ex. 3 at 1.) SMS agreed to reimburse the City of Seattle for LTK's services with respect to the Monorail. (*See id.* Ex. 27.) One of SMS's objectives for the project was to "[r]edesign" "the car body grounding system to prevent the electrical shock hazard that currently existed." (*Id.* at 1.)

On August 31, 2001, LTK issued a draft copy of its "Grounding and High Voltage Auxiliary Survey" to Mr. Barney. (4/20/12 Wahtola Decl. Ex. 1 (4/10/12 Barney Dep.) at 94:8 – 95:19.) In the survey, LTK specifically states that it is not recommending that the existing bonded grounding system be returned to the original floating design. (*See* 5/1/12 Wahtola Decl. Ex. 8 at 3 ("We are not recommending the re-installation of the

original grounding system.").) AFM alleges that LTK documented the 1997 change in the Monorail's grounding system in this survey without expressly acknowledging LTK's role in the 1997 design change. (*See* 3/30/12 Wahtola Decl. ¶ 25 & Ex. 5.)

The contracted scope of LTK's work with respect to the Monorail in the 2001/2002 time period included a reorganization of the terminal board installations that LTK had been responsible for in the past. (Way Decl. ¶ 10.) AFM alleges that when the grounding system was changed by LTK in 1997/1998, the change was made by installing a wire to create a bond (or electrical connection) between the car body and the motor control terminal board by installing a wire, thereby changing the grounding system from a floating body to a bonded (or grounded) car body system. (*See id.*; *see also id.* ¶ 7(d).) Thus, in the 2001/2002 timeframe, LTK re-routed all of the grounding connections on the Monorail, and reorganized the grounding system, so that all of the grounded connections were run through a newly designed terminal board. (*Id.* ¶ 10.) AFM alleges that this reorganization of the grounding system in the 2001/2002 timeframe retained the bonded grounding system which LTK had redesigned in the 1997/1998 timeframe from its original floating configuration. (*Id.*)

Although in 2001, Mr. Barney may not have known when the grounding system had been initially redesigned from a floating to a bonded system or who initially was responsible for the redesign, by at least March 10, 2002, he understood that LTK was not recommending reconverting the grounding system for the Monorail from a bonded system back to a floating design. (4/20/12 Wahtola Decl. Ex. 1 (4/10/12 Barney Dep.) at 111:24 – 112:6).) In addition, he has testified that by at least May 2002, he understood

that the original floating grounding system had been converted into a bonded system in 1997, and that this conversion was the cause of the June 29, 2001 electrical "arcing" incident that burned a hole in the body of an SMS vehicle and the cause of the electrical shocks to SMS maintenance staff. (*Id.* at 126:9-23.)

On June 25, 2002, Mr. Barney wrote a letter to Ms. Stephanie Van Dyke of the City of Seattle. (5/1/12 Wahtola Decl. (Dkt. # 81) Ex. 17.) In this letter, Mr. Barney stated that he did not believe that LTK's services with respect to the Monorail's grounding system were performed adequately. (4/20/12 Wahtola Decl. Ex. 1 (Barney Dep.) at 140:25 – 141:23.) In particular, Mr. Barney explained that he did not believe that the bonded grounding system as designed by LTK would prevent the car bodies from having holes burned in them due to electrical "arcing" or prevent electrical shocks to passengers or SMS technicians. (*See id.* at 141:24 – 142:25; *see also* 5/1/12 Wahtola Decl. Ex. 17.)

On July 15, 2002, Mr. Barney, representing SMS, attended a meeting convened by the City of Seattle for the specific purpose of discussing the Monorail's grounding system as designed by LTK. (*Id.* at 146:13-147:15.) At this meeting, Mr. Barney, on behalf of SMS, advocated for a floating grounding system, while representatives of LTK argued that the grounded or bonded system LTK had designed should remain. (*Id.* at 148:16 – 149:3.) As a result of the meeting, the City of Seattle determined that the bonded grounding system designed by LTK would remain. (*See id.* at 156:18 – 157:16; 151:23-25.) Mr. Barney has testified that he was not happy with the results of the July 15, 2002 meeting. (*Id.*)

On the same day, Mr. Barney issued a memorandum to the City of Seattle, entitled "Notice of Agreement Termination," in which he stated that he was terminating SMS's agreement to reimburse the City of Seattle for LTK's services. (*See* 5/1/12 Wahtola Decl. Ex. 27.) In this letter, Mr. Barney states that the objective of redesigning the car body grounding system to prevent electrical shock hazard had not been met. (*See id.* at 1.) He further states:

> The car body grounding system was designed in a manor [sic] that SMS had informed LTK at the beginning of the project would not be acceptable. An electrical shock experienced by one of the refurbishment contractor's employees following renovation of the grounding system, confirmed that the objective was not met.

(*Id.* at 2.)

With respect to his July 15, 2002 termination of SMS's agreement with the City of Seattle to pay for LTK's services, Mr. Barney has testified as follows:

> A: . . . I terminated the agreement between SMS and the City, where the agreement existed that they would hire a contractor [LTK] that would resolve the problem SMS had in that the trains shocked the passengers.
>
> Q: And the trains –
>
> A: -- still shocked the passengers.
>
> Q: And had electrical arcing burning holes in the car body?
>
> A: That too.
>
> Q: So you were aware of that condition, you were aware of those circumstances, the damages that you claimed to have resulted, and as a consequence, you took it upon yourself to issue a notice terminating the agreement between SMS and the City of Seattle to reimburse the City for LTK's services, correct?
>
> A: Yes.

>    Q: Okay. Did you, or anyone else within SMS, contemplate taking legal action at this point in time because you were being forced to operate and maintain the system that you believed was hazardous, affecting your ability to operate the trains, and resulting in property damage?
>
>    **********
>
>    A: But the answer is no.
>
>    Q: Is it your understanding you could have, but you just chose not to?
>
>    **********
>
>    A: I suppose anything could have, but I don't think anybody considered taking legal action.

(4/20/12 Wahtola Decl. Ex. 1 (Barney Dep.) at 161:24 – 163:3 (objections omitted).)

In response to LTK's motion for summary judgment, AFM's expert witness, Mr. Paul Way has testified in a declaration that "[i]n the 2000-2002 timeframe, Glenn Barney did not know when the grounding system for the Monorail had been redesigned [to a bonded system] or who was responsible for authorizing this change." (Way Decl. ¶ 12.)[2] For purposes of this motion for summary judgment, however, the fact that Mr. Barney may not have known in the 2001/2002 timeframe that LTK had initially redesigned the Monorail's grounding system from a floating to a bonded design in 1997 is immaterial.

---

[2] Although LTK has not objected to this testimony by Mr. Way, the court notes that it may be subject to a hearsay objection if offered at trial, and therefore, may not be competent evidence for purposes of opposing LTK's motion for summary judgment either. *See* Fed. R. Civ. P. 56(c)(2) & (4). In any event, Mr. Way's testimony in this regard is contradicted at least in part by Mr. Barney's own deposition testimony in which he states that by at least May 2002, he understood that the original floating grounding system had been converted into a bonded system in 1997, although he did not know at this time who was responsible for the original conversion. (*Id.* at 125:23 - 126:15.)

Based on Mr. Barney's own deposition testimony above, it is undisputed that by at least July 15, 2002, he knew that (1) in 2002 LTK had refused to alter the bonded nature of the Monorail's grounding system or return it to a floating design, (2) LTK had undertaken and was responsible for redesigning the bonded grounding system on the Monorail in the 2001/2002 time period, and (3) this redesigned grounding system had not resolved the electrical shock problems associated with the bonded grounding system that had been occurring prior to LTK's work during 2001/2002. Thus, there is no factual dispute that, by at least July 15, 2002, SMS knew that, as a result of the bonded grounding system redesigned by LTK in 2001/2002, people were continuing to experience electrical shocks, and property damage was continuing to occur to the Monorail in the form of holes burned into its car bodies.

AFM, as the subrogee of SMS, filed suit against LTK in King County Superior Court for the State of Washington on November 7, 2006. (Not. of Removal (Dkt. # 1) (attaching complaint).) LTK removed the action to federal district court for the Western District of Washington on December 7, 2006. (*See id.*) LTK has now moved for summary judgment with respect to AFM's negligence claim on two grounds. (*See generally* Mot. (Dkt. # 80).) First, LTK asserts that AFM's claim must be dismissed because the allegations in AFM's complaint no longer adequately correspond to AFM's allegations against LTK following discovery in this action. (*See id*. at 2-5, 17-21.) Second, LTK asserts that AFM's claim for negligence must be dismissed because it is barred by the applicable statute of limitations. (*See id.* at 5-17, 21-24.) Because the court

resolves this motion on the basis of the statute of limitations, the court does not reach LTK's first ground for summary judgment.

### III. ANALYSIS

**A. Standard**

Summary judgment is appropriate if the evidence demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Galen v. Cnty. of L.A.*, 477 F.3d 652, 658 (9th Cir. 2007). The moving party bears the initial burden of showing that there is no genuine issue of material fact and that he or she is entitled to prevail as a matter of law. *Celotex*, 477 U.S. at 323. If the moving party meets his or her burden, then the non-moving party "must make a showing sufficient to establish a genuine dispute of material fact regarding the existence of the essential elements of his case that he must prove at trial" in order to withstand summary judgment. *Galen*, 477 F.3d at 658. The court is "required to view the facts and draw reasonable inferences in the light most favorable to the [non-moving] party." *Scott v. Harris*, 550 U.S. 372, 378 (2007). Only disputes over the facts that might affect the outcome of the suit under the governing law are "material" and will properly preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Whether a statute of limitations bars a suit is a legal question, but ordinarily the jury must decide the underlying factual questions. *Goodman v. Goodman*, 907 P.2d 290, 294 (Wash. 1995). Where, however, the underlying facts are susceptible of but one

reasonable interpretation, the court may determine the issue on summary judgment. *See id.* Further, although the issue of whether a plaintiff should have been able to discover salient facts concerning a claim earlier generally presents factual questions, the court may decide the applicability of the discovery rule as a matter of law where the facts are susceptible to only one reasonable interpretation. *Hipple v. McFadden*, 255 P.3d 730, 735 (Wash. Ct. App. 2000).

### B. AFM's Position as Subrogee of SMS

AFM has alleged that it is "contractually and equitably subrogated to the legal rights possessed by [SMS] . . . against . . . LTK . . . ." (Compl. ¶ 5.1.) "'Subrogation' is '[t]he principle under which an insurer that has paid a loss under an insurance policy is entitled to all the rights and remedies belonging to the insured against a third party with respect to any loss covered by the policy.'" *Mut. of Enumclaw Ins. Co. v. USF Ins. Co.*, 191 P.3d 866, 874 (Wash. 2008) (quoting BLACK'S LAW DICTIONARY at 1467 (8th ed. 2004)). "An insurer entitled to subrogation 'stands in the shoes' of the insured and is entitled to the same rights and subject to the same defenses as the insured." *Id.* (citing *Fireman's Fund Ins. Co. v. Md. Cas. Co.*, 77 Cal Rptr. 296, 303 (Cal. Ct. App. 1998)); *see also Cmty. Ass'n Underwriters of Am., Inc. v. Kalles*, 259 P.3d 1154, 1157 (Wash. Ct. App. 2011). "Because of the derivative nature of subrogation, a subrogee insurer is subject to 'the same statute of limitations that would have been applicable had the insured brought suit in his or her own behalf.'" *Emp'rs Ins. of Wausau v. Granite State Ins. Co.*, 330 F.3d 1214, 1217-18 (9th Cir. 2003) (interpreting similar California common law and quoting Windt, Insurance Claims and Disputes § 10.11 at 554 (2d ed. 1988)). Thus, the

statute of limitations that would have applied to SMS if SMS had sued LTK directly is the same statute of limitations that applies to AFM as SMS's subrogee.

**C. Statute of Limitations**

In Washington, a three-year statute of limitations governs claims of negligence. *See Wash. v. Boeing Co.*, 19 P.3d 1041, 1050 (Wash. Ct. App. 2000) (stating that negligence claims are subject to the three-year limitations period in RCW 4.16.080). "Statutes of limitations do not begin to run until a cause of action accrues." *1000 Va. Ltd. P'ship*, 146 P.3d at 428 (citing RCW 4.16.005.)

AFM asserts that the statute of limitations did not begin to run here until May 31, 2004 – the day on which a fire damaged the Blue and Red Trains of the Monorail for which AFM paid $3,267,861.00 in damages to SMS. (*See* Resp. (Dkt. # 94) at 5; Compl. ¶¶ 3.2, 5.1.) According to AFM, this is the date upon which SMS's cause of action against LTK accrued, and therefore it is also the date upon which AFM's subrogation action against LTK accrues. (*See* Resp. at 5-6.) AFM asserts that it would be an "absurdity" to argue that the statute of limitations could start to run before the date on which the fire occurred for which it seeks damages. (Resp. at 6.) If AFM is correct, then the three-year statute of limitations would not have expired by the time AFM filed its subrogation action against LTK on November 7, 2006. (*See* Compl. at 1 (containing court stamp indicating 11/7/06 filing date).)

LTK, however, asserts that SMS's negligence claim (and AFM's subrogation claim) against LTK accrued almost two years prior to the May 31, 2004 fire. (*See* Mot. at 23.) LTK asserts that by July 15, 2002 SMS had knowledge of all the essential elements

of its cause of action for negligence against LTK – duty, breach, causation, and injury, and that, accordingly, the three-year statute of limitations with respect to AFM's subrogation claim began to run by that date. (*See generally* Mot. at 21-24.)

In Washington, the discovery rule states that the statute of limitations starts to run on a negligence claim when the plaintiff discovers, or in the exercise of reasonable diligence should have discovered, facts giving rise to the cause of action. *See Hipple v. McFadden*, 255 P.3d 730, 735 (Wash. Ct. App. 2011) (citing *Peters v. Simmons*, 552 P.2d 1053, 1056 (Wash. 1976)); *1000 Va. Ltd. P'ship*, 146 P.3d at 428 (stating that under the "discovery rule of accrual, . . . a cause of action accrues when the plaintiff discovers, or in the reasonable exercise of diligence should discover, the elements of a cause of action."). "This does not mean that the action accrues when the plaintiff learns that he or she has a legal cause of action; rather, the action accrues when the plaintiff discovers the salient facts underlying the elements of the cause of action." *Id.*

LTK asserts that at least by July 15, 2002, Mr. Barney of SMS knew all of the salient facts necessary for SMS to assert a claim against LTK based on LTK's redesign of the Monorail's grounding system. (*See* Mot. at 21-24.) Mr. Barney knew that LTK had redesigned the grounding system in 2001/2002 but had decided not to alter the bonded nature of that system or return it to a floating design. (4/20/12 Wahtola Decl. Ex. 1 (4/10/12 Barney Dep.) at 111:24 – 112:6; 148:16 – 149:3; 156:18 – 157:16; 151:23-25.) He knew that, as a result of the Monorail's bonded grounding system, SMS technicians and Monorail passengers were receiving electrical shocks and electrical "arcing" was burning holes through the bodies of Monorail cars. (*See* 5/1/12 Wahtola Decl. Ex. 27;

4/20/12 Wahtola Decl. Ex. 1 (Barney Dep.) at 161:24 – 163:3.) Correcting the problem with the grounding system was in fact one of the reasons he sought LTK's engineering expertise on behalf of SMS in the first place. (5/1/12 Wahtola Decl. Ex. 3 at 1.) Mr. Barney also knew that the injuries to persons and property that had been occurring prior to LTK's 2001/2002 redesign of the system were continuing to occur following LTK's work in the 2001/2002 time period. (*Id.* Ex. 27 at 2; 4/10/12 Wahtola Decl. Ex. 1 (Barney Dep.) at 161:24 – 162:6.) Finally, he attributed those injuries to the inadequacy of LTK's engineering design work. (*Id.* at 161:24 – 162:13; 5/1/12 Wahtola Decl. Ex. 27 at 2.)

LTK further asserts that the fact that the May 31, 2004 fire, which forms the lions' share of SMS's damages, had not yet occurred does not affect the accrual date of SMS's cause of action against LTK or the commencement of the statutory period by at least July 15, 2002. (*See* Reply (Dkt. # 97) at 5-6.) LTK asserts that the statute of limitations commences running following even a slight injury that is incurred as the result of the negligent act of another, and that it is immaterial that a more substantial injury related to the same negligent act does not appear until later. (*See* Mot. at 22.)

The court agrees. In *Lindquist v. Mullen*, 277 P.2d 724, 725 (Wash. 1954), *overruled in part by Ruth v. Dight*, 453 P.2d 631 (Wash. 1969) (establishing the discovery rule), the Washington Supreme Court stated:

> [W]here an injury, although slight, is sustained in consequence of the wrongful act of another, and the law affords a remedy therefor, the statute of limitations attaches at once. It is not material that all the damages resulting from the act shall have been sustained at that time, and the

running of the statute is not postponed by the fact that the actual or substantial damages do not occur until a later date.

*Id.* at 725.

In *Green v. A.P.C.*, 960 P.2d 912, 916 (Wash. 1998), the Washington Supreme Court further explained that "[t]he adoption of the discovery rule in *Ruth* modified this statement [in *Lindquist*] by declaring the statute of limitations does not attach at once, but only upon discovery of the harm." *Id.* "Nevertheless, the essence of the statement remains the same: the running of the statute is not postponed until the specific damages for which the plaintiff seeks recovery actually occur." *Id.* (citing *Reichelt v. Johns-Mansville Corp.*, 733 P.2d 530, 536 (Wash. 1987); *Steele v. Organon, Inc.*, 716 P.2d 920, 922 (Wash. Ct. App. 1986) ("Generally, if the plaintiff is aware of some injury, the statute of limitations begins to run even if he does not know the full extent of his injuries."); *Zaleck v. Everett Clinic*, 802 P.2d 826, 827-28 (Wash. Ct. App. 1991)). The *Green* court reasoned that:

> To hold otherwise would run contrary to important policy considerations such as Washington's strong preference for avoiding the splitting of causes of action. . . . In effect, a plaintiff would have a new action for damages for each new condition that became manifest. This could also lead to the highly impractical consequence of multiple statutes of limitations applying to the same allegedly wrongful conduct. We reject an approach leading to such a result.

960 P.2d at 916 (citation omitted).

Based on the precepts set forth in *Lindquist* and *Green*, the court concludes that the statute of limitations with respect to SMS's negligence claim against LTK began to run by at least July 15, 2002. As of that date, there is no material factual dispute that

SMS knew that the bodies of Monorail vehicles were incurring property damage and Monorail passengers and SMS personnel were experiencing electrical shocks as the result of LTK's allegedly negligent design work on the Monorail's grounding system in the 2001/2002 time frame.

The court also finds instructive the Washington Court of Appeals decision in *Steele*. *Steele* involved a suit for medical malpractice against a physician for allegedly prescribing an overdose of medication. 716 P.2d at 920-22. In July 1973, the plaintiff was hospitalized for a severe migraine. *Id.* at 921. The defendant physician prescribed migraine medication upon the plaintiff's discharge from the hospital. *Id.* Due to ambiguous instructions with respect to the medication, the plaintiff suffered an overdose. *See id.* She experienced loss of sensation in her arms and legs and was hospitalized again. *Id.* Some months later, the plaintiff felt tingling in her hands and feet. *Id.* She sought the advice of an attorney at this point in time, but they believed that any damages arising from the overdose would be limited and decided that the cost of a lawsuit would exceed the amount of the plaintiff's recovery. *Id.*

In 1981, the plaintiff suffered a heart attack. *Id.* She entered a hospital for by-pass surgery and, while there, she suffered a stroke. *Id.* at 921-22. She was subsequently advised by her physician at the time that both the heart attack and the stroke were related to her previous overdose. *Id.* at 922. In 1982, she filed suit against the physician who treated her for migraines in 1973. *Id.* The trial court dismissed her action on summary judgment based in part on expiration of the statute of limitations. *Id.* The plaintiff appealed arguing that her suit was not barred because the injuries for which she sued –

the heart attack and stroke – did not occur until 1981. *Id.* The Washington Court of Appeals disagreed, stating:

> Although [the plaintiff] may have considered the amount of her damages small in 1975, nevertheless, it is uncontroverted she was aware of some injury. Early on, she had suffered actual and appreciable damages resulting from the drug overdose, i.e., she experienced loss of sensation in her arms and legs and required hospital care. Thus, the trial court was correct when it determined Mrs. Steele knew all of the elements of a cause of action in 1975.

*Id.* at 923. Based on this rationale, the Court of Appeals upheld the trial court's dismissal of the plaintiff's action. *Id.* at 924.

Similar to the plaintiff in *Steele*, SMS (through Mr. Barney) knew about LTK's alleged negligent redesign of the Monorail's grounding system at least as early as July 15, 2002. In addition, SMS knew that it had been injured as a result of LTK's negligent redesign in the form of electrical shocks to SMS technicians and Monorail passengers and in the form of electrical arcing that burned holes in the sides of Monorail cars. Thus, SMS knew or should have known all of the necessary salient facts giving rise to its cause of action against LTK by at least July 15. 2002. Like the later heart attack and stroke suffered by the plaintiff in *Steele*, SMS suffered a significantly more severe injury due to LTK's alleged negligent redesign with the occurrence of the May 31, 2004 fire. Just as in *Steele*, however, the fact that SMS suffered even greater injury at a later date does not postpone the running of the statute of limitations. Accordingly, the court grants LTK's motion for summary judgment and holds that AFM's subrogation action against LTK for negligence is barred by the applicable three-year statute of limitations.

## IV. CONCLUSION

Based on the foregoing analysis, the court GRANTS LTK's motion for summary judgment (Dkt. # 80) and DISMISSES AFM's complaint with prejudice. The court further DENIES all other pending motions (*see* Dkt. # 98) as MOOT due to the court's order of dismissal on summary judgment.

Dated this 13th day of June, 2012.

JAMES L. ROBART
United States District Judge