UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| AFFILIATED FM INSURANCE CO., | CASE NO. C06-1750JLR |
| Plaintiff, | ORDER REGARDING DEFENDANT'S *DAUBERT* MOTIONS |
| v. | |
| LTK CONSULTING SERVICES, INC., | |
| Defendant. | |

## I.      INTRODUCTION

Before the court are three motions by Defendant LTK Consulting Services, Inc.

("LTK"):  (1) LTK's motion to exclude the testimony of Plaintiff Affiliated FM

Insurance Company's ("AFM") expert witness, Paul Way (Way Mot. (Dkt. # 174)), (2)

LTK's motion to exclude the testimony of AFM's expert witness, Eric Rongren (Rongren

Mot. (Dkt. # 175)), and (3) LTK's motion to exclude the testimony of AFM's expert

witness, John Dexter (Dexter Mot. (Dkt. # 176)).[1]  The court has reviewed LTK's

motions, all submissions filed in support of or opposition thereto, the balance of the

record, and the applicable law.  In addition, the court conducted a hearing on April 15,

2014, during which it heard testimony and argument related to these motions.  Being

fully advised, the court GRANTS in part and DENIES in part LTK's motion with respect

to Mr. Way, and GRANTS LTK's motions with respect to the expert testimony of Mr.

Rongren and Mr. Dexter.  However, as discussed below, Mr. Rongren and Mr. Dexter

may have relevant factual testimony to offer apart from any designation by AFM as

expert witnesses.  The admissibility of factual testimony from Mr. Rongren and Mr.

Dexter is not presently before the court, and the court makes no determination concerning

that issue in this order.

## II.    BACKGROUND

This action arises out of a fire that occurred on May 31, 2004, and damaged the

Blue and Red Trains of Seattle Monorail as the Blue Train was leaving the Seattle Center

---

[1] In its responsive memorandum, AFM moves to strike LTK's *Daubert* motions because LTK did not file them as one motion pursuant to Local Rule LCR 7(d)(4).  *See* Local Rules W.D. Wash, LCR 7(d)(4).  Local Rule 7(d)(4) requires the parties to file any motions *in limine* as one motion, except on a showing of good cause.  *See id.*  In this instance, however, the court directed the parties to file any *Daubert* motions no later than February 13, 2014 (*see* Min. Entry (Dkt. # 167)), despite the fact that motions *in limine* are not due until March 24, 2014 (*see* Sched. Ord. (Dkt. # 150) at 1).  Thus, assuming (without deciding) that *Daubert* motions constitute a subset of motions *in limine* that fall under the strictures of Local Rule LCR 7(d)(4), the court had already directed the parties to split these motions.  Further, the court did not expressly direct the parties to file their *Daubert* motions in one document.  The court, therefore, concludes that even assuming LTK's *Daubert* motions would ordinarily be governed by the limitations set forth in Local Rule LCR 7(d)(4), LTK had good cause to conclude it was allowed to file its *Daubert* motions separately here.  Accordingly, the court DENIES AFM's motion to strike LTK's *Daubert* motions.

Station.  (*See* Not. of Rem. (Dkt. # 1) at 7 (Compl. ¶¶ 1.1, 3.2).)  AFM paid its insured, Seattle Monorail Service ("SMS"), $3,267,861.00 for damages resulting from the fire. (*Id.* ¶ 5.1.)  AFM, as the subrogee of SMS, brings this action against LTK, which is an engineering firm that conducted work with respect to the Monorail. (*Id.*)

Following the May 31, 2004, fire, Booz Allen Hamilton ("Booz Allen") prepared a "Fire Safety Assessment" ("FSA") report, which contains a number of recommendations purporting to improve the safety of the Monorail.  (Dexter Mot. Ex. A1.)  A significant portion of SMS's alleged damages related to the fire consisted of the costs involved in implementing the recommendations contained in the FSA report. (Wahota Decl. (Dkt. # 52) Ex. 5 ("AFM's Interrogatory Ans.") at 9 (No. 15) (indicating the cost to comply with the FSA report totaled $2,100,000.00).)

Based on Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993), LTK challenges the admission of testimony from three witnesses that AFM has designated as experts in this matter.  First, LTK challenges that admission of testimony from AFM's expert witness, Paul Way.  In his November 6, 2013, expert report, Mr. Way states that LTK negligently performed professional engineering services by not recommending that the grounding system for the Monorail be converted from a "grounded" or "bonded" system to a "floating" system, and he offers a number of opinions related to the contention that a "grounded" or "bonded" grounding system is improper, unsafe, and/or negligent and that a "floating" grounding system is not.  (*See* Way Mot. at 2-3; *see generally* AFM's 2d Exp. Disclosures (Dkt. # 151) Ex. 3 ("Way Report") at 29-49).)

1    LTK also challenges the admission of testimony from Eric Rongren, another of

2  AFM's designated expert witnesses.  (*See* Rongren Mot. 1-3.)  AFM has designated Mr.

3  Rongren to testify regarding the type of grounding system that was present on the

4  Monorail at the time King County Metro operated the system.  Mr. Rongren will testify

5  that the grounding system was "floating" during the time he worked as a maintenance

6  manager for the Monorail between 1986 and 1994.  (AFM's 2d Expert Disclosures (Dkt.

7  # 151) at 2-3.)

8    Finally, LTK challenges the admission of testimony from AFM's expert witness,

9  John Dexter.  (Dexter Mot. at 1-3.)  AFM has disclosed Mr. Dexter as an expert witness

10  for the purpose of testifying regarding the substance of the FSA report.  Specifically,

11  AFM's expert witness disclosure states:

12    Mr. Dexter was retained by [SMS] prepare [sic] a fire safety assessment for
      the Seattle Monorail after the fire for submission to the Washington State
13    department of Transportation in order to allow the Seattle Monorail to
      resume operation.  Mr. Dexter's opinions and the bases for them are
14    contained in the [FSA report] dated March 29, 2005.

15  (AFM's 2d Expert Disclosures at 4-5.)  The court considers each challenge based on the

16  written submissions of the parties and the testimony and argument presented at the April

17  15, 2014, hearing.

18                          **III.    ANALYSIS**

19    Rule 702 of the Federal Rules of Evidence governs the admission of expert

20  testimony in federal court:

21    A witness who is qualified as an expert by knowledge, skill, experience,
      training, or education may testify in the form of an opinion or otherwise if:
22    (a) the expert's scientific, technical, or other specialized knowledge will

ORDER- 4

1  help the trier of fact to understand the evidence or to determine a fact in
2  issue; (b) the testimony is based on sufficient facts or data; (c) the
   testimony is the product of reliable principles and methods; and (d) the
3  expert has reliably applied the principles and methods to the facts of the
   case.

4  Fed. R. Evid. 702. "Rule 702 . . . require[s] that '[e]xpert testimony . . . be both relevant

5  and reliable.'" *Estate of Henry Barbain v. Astenjohnson, Inc.*, 740 F.3d 457, 463 (9th Cir.

6  2014) (quoting (*United States v. Vallejo*, 237 F.3d 1008, 1019 (9th Cir. 2001)).

7      "Relevancy simply requires that '[t]he evidence . . . logically advance a material

8  aspect of the party's case.'" *Id.* (quoting *Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir.

9  2007)).  Reliability requires the court to assess "whether an expert's testimony has 'a

10 reliable basis in the knowledge and experience of the relevant discipline.'" *Id.* (quoting

11 *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149 (1999) (citation and alterations

12 omitted)).  The court is concerned not with the correctness of the expert's conclusions but

13 the soundness of the methodology.  *Id.*  The court must act as a gate keeper to exclude

14 "junk science" that does not meet Rule 702's reliability standards.  *Id.*  (quoting *Ellis v.*

15 *Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011)).

16     The Supreme Court has clarified that the reliability standard is "a flexible one."

17 *Kumho Tire*, 526 U.S. at 150.  The Court has suggested several factors that can be used to

18 determine reliability:  (1) whether a theory or technique can be tested; (2) whether it has

19 been subjected to peer review and publication; (3) the known or potential error rate of the

20 theory or technique; and (4) whether the theory or technique enjoys general acceptance

21 within the relevant scientific community.  *Estate of Henry Barbain*, 740 F.3d at 463

22 (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592-94 (1993)).  However,

ORDER- 5

1    whether these specific factors are "reasonable measures of reliability in a particular case

2    is a matter that the law grants the trial judge broad latitude to determine." *Id.* (citing

3    *Kumho Tire*, 526 U.S. at 153).

4         The court notes that LTK has not challenged the testimony of Mr. Way, Mr.

5    Rongren, or Mr. Dexter based on the relevancy prong of Rule 702. (*See generally* Way

6    Mot., Rongren Mot., Dexter Mot.)  In any event, based on its review of the parties'

7    written submissions and the testimony and argument presented at the April 15, 2014,

8    hearing, the court finds that the testimony of these witnesses is relevant and (if found to

9    be reliable) may assist the trier of fact.  Thus, the only issue before the court regarding

10   the admissibility of these witnesses' proposed expert testimony is its reliability under

11   Rule 702.

12   **A.  Paul Way**

13        Mr. Way asserts a number of opinions involving the notion that a "bonded"

14   grounding system is improper, unsafe or negligent for use on the Monorail.  (Way Report

15   ¶¶ 5.1, 5.4-5.5, 5.7.)  Although Mr. Way is an electrical engineer, LTK challenges these

16   opinions on the ground that Mr. Way's expertise is not developed in the area of mass

17   transit vehicles.  (Way Mot. at 7, 9.)  Indeed, Mr. Way acknowledged in the course of his

18   deposition that he has never been responsible for designing a grounding system on a mass

19   transit vehicle nor been involved in analyzing the propriety of a floating grounding

20   system versus a grounded grounding system prior to this litigation.  (Way Dep. (Dkt.

21   # 174-1) at 12:20-13:3.)

22

1    Mr. Way has a depth of electrical engineering experience that includes designing

2 grounding systems for petrochemical facilities, sewage treatment plants, water pump

3 stations, crude oil pipelines, oil refineries, power plants, and electrical power substations.

4 He has received specialized training in grounding and bonding microwave and

5 telecommunications facilities.  He has been trained in ground system testing and

6 evaluation and has completed hundreds of field tests on installed ground system

7 effectiveness.  He has been hired as an electrical engineer consultant with regard to

8 proper grounding and bonding of electrical equipment for marine transportation systems

9 and for the King County Metro.  Over the course of his career, Mr. Way has completed

10 failure investigations involving electrical power, grounding, and bonding issues on fixed

11 facility, transportation, industrial, commercial, and residential electrical systems.[2]

12    LTK asserts that, despite Mr. Way's qualifications as an electrical engineer in

13 general, because he has no particular experience pertaining to grounding systems for

14 mass transit vehicles, he is not qualified to propone any opinions concerning the

15 grounding system on the Monorail.  (*See* Way Mot. at 7, 9.)  Rule 702, however,

16 "contemplates a *broad conception* of expert qualifications."  *Hangarter v. Provident Life*

17 *and Acc. Ins. Co.*, 373 F.3d 998, 1018 (9th Cir. 2004) (italics in original) (quoting

18 *Thomas v. Newton* Int'l Enters., 42 F.3d 1266, 1269 (9th Cir. 1994)).  Any deficiency in

19 Mr. Way's particularized expertise goes to the weight that should be accorded his

20

21    [2] *See generally* Way Expert Report (Dkt. # 58-2) at 39-43 (attaching his curriculum

vitae).  In addition, Mr. Way provided testimony to the court concerning his background and

22 credentials at the April 15, 2014, hearing.

1   testimony, and not the admissibility of his opinion as an expert witness.  *See United*

2   *States v. Garcia*, 7 F.3d 885, 889-90 (9th Cir. 1993).

3          In addition, LTK asserts that the reliability of Mr. Way's opinions are undermined

4   by the fact they were not developed independent of his retention by AFM for purposes of

5   testifying in this litigation and have not been peer reviewed.  (Way Mot. at 8.)  LTK

6   asserts that because Mr. Way's opinions lack these indicators of reliability, he must

7   explain precisely how he reached his conclusions and point to some objective source—a

8   learned treatise, a policy statement of a professional association, a published article in a

9   reputable scientific journal, or the like, in support of his opinions.  (*Id.* at 8-9 (citing

10  *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1318-19 (9th Cir. 1995)

11  ("*Daubert II*").)

12         The Ninth Circuit has held that "whether [expert witnesses] have developed their

13  opinions expressly for testifying" is a "very significant fact to be considered" in

14  evaluating the admissibility of an expert witness's testimony.  *Wornick*, 264 F.3d at 841.

15  Here, however, Mr. Way testifies that his opinions are reliable and admissible because he

16  followed National Fire Protection Association ("NFPA") standards, specifically NFPA

17  921, in performing his analysis.  (*See generally* Way Report.)  The purpose of NFPA 921

18  is to establish guidelines and recommendations for the safe and systematic investigation

19  and analysis of fires.  LTK argues that this standard and form of analysis are not

20  appropriate in a case involving a dispute over whether a grounding system caused the fire

21  at issue.  (Way Reply (Dkt. # 185) at 4-5.)  Nevertheless, numerous courts have found

22  NFPA to be an acceptable guide for fire investigation methodology.  *See Schlesinger v.*

1  *United States*, 898 F. Supp. 2d 489, 504 (E.D.N.Y. 2012) (collecting cases); *Russ v.*

2  *Safeco Ins. Co.*, No. 2:11cv195-KS-MTP, 2013 WL 1310501, at *24 (S.D. Miss. Mar. 26,

3  2013) (collecting cases); *Tunnell v. Ford Motor Co.*, 330 F. Supp. 2d 731, 739-41 (W.D.

4  Va. 2004) (admitting expert opinions from electrical engineer who employed NFPA 921

5  in investigating fire whose origins were allegedly electrical).  Despite the fact that Mr.

6  Way reached his opinions herein solely as a result of his retention by AFM in this

7  litigation, his adherence to a recognized industry method and standard, specifically NFPA

8  921, undergirds the reliability of his opinions concerning the origins of the fire in a

9  manner that suffices for purposes of admissibility under Rule 702 or *Daubert.*  The court,

10  therefore, finds that, in addition to being relevant, this portion of Mr. Way's expert

11  testimony also meets the reliability standard of Rule 702.  Accordingly, the court denies

12  LTK's motion as it relates to this portion of Mr. Way's expert testimony.

13       In addition, however, LTK also challenges Mr. Way's opinion 5.2, in which he

14  states that "[t]he Monorail was operated for approximately 27 years with a floating body

15  grounding system without a major electrical fault incident."  (Way Report ¶ 5.2.)  LTK

16  asserts that, on its face, opinion 5.2 is a fact statement and not an opinion.  LTK objects

17  that opinion 5.2 is "the result of observational evidence that could be provided by a lay

18  person, and its presentation by an expert cannot be said to 'help the trier of fact to

19  understand the evidence or to determine a fact in issue.'"  (Way Mot. at 10 (citing Fed. R.

20  Evid. 702).)  AFM offered no written response to this portion of LTK's motion to

21

22

exclude Mr. Way's expert opinion 5.2.[3]  At the April 15, 2014, hearing, counsel for AFM

acknowledged that opinion 5.2 is better characterized as a factual underpinning for Mr.

Way's other opinions, rather than a separate opinion in and of itself.  Mr. Way states that

his opinion 5.2 is based on his review of various schematics, drawings, and wiring

diagrams between 1961 and 1997 that all depict a floating body grounding system for the

Monorail, along with the fact that "[n]o reports exist of any faults related to the Monorail

electrical system operation prior to the grounding system change in 1998."  (Way Report

at 30-31.)  Mr. Way does not explain in his expert report how he concludes that there is

an absence of reports concerning faults related to the electrical system prior to 1998.  (*See*

*generally id.*)  Assuming, however, that counsel can lay a proper foundation for Mr.

Way's testimony in this regard at trial, the court will permit him to testify concerning

opinion 5.2, but as factual foundation underpinning his other opinions only and not as one

of his expert conclusions.  Accordingly, the court grants in part and denies in part LTK's

motion with respect to Mr. Way as described above.

## B.  Eric Rongren

AFM has designated Mr. Rongren to testify as an expert witness offering the

opinion that the Seattle Monorail employed a "floating" grounding system from 1986 to

1994.  Specifically, Mr. Rongren's expert disclosure states:

---

[3] LTK asserts that AFM's lack of response requires the court to grant its motion at least with respect to opinion 5.2.  The court's local rule, however, is formulated as permissive, not mandatory.  Thus, AFM's failure to respond "may be considered by the court as an admission that the motion has merit."  *See* Local Rules W.D. Wash. LCR 7(b)(2).  The court is under no compulsion to grant a motion, even though the opposing party has failed to respond, if the court does not believe the motion has sufficient merit.

1   Mr. Rongren was in charge of maintenance for the Seattle Monorail on
    behalf of King County Metro from 1986 until 1994 when [SMS] took over
2   operation of the Seattle Monorail.  Mr. Rongren is familiar with the original
    design of the train body grounding system for the Seattle Monorail.  Mr.
3   Rongren will testify that the Seattle Monorail employed a "floating"
    grounding system during his entire career working on the Monorail for
4   Metro.

5   (AFM's 2d Expert Disclosures at 2-3.)

6       LTK has moved to exclude Mr. Rongren's testimony in this regard on two

7   grounds.  First, LTK has moved to exclude Mr. Rongren on grounds that he has

8   disclaimed any expertise in electrical engineering.  (*See* Rongren Mot. at 5-6 (citing

9   Rongren Dep. (Dkt. # 175-1) at 12:9-23.)  Second, LTK has moved to exclude Mr.

10  Rongren's testimony as an expert witness based on admissions he made during his

11  deposition specifically disclaiming any qualification to testify as to how the Monorail

12  was actually grounded during his tenure with King County Metro.  (*See id.* at 6-8.)

13      AFM asserts in response that Mr. Rongren is qualified to testify based on his

14  experience as a maintenance manager for the Monorail from 1984 to 1994 and "his

15  review of the original drawings for the Monorail and maintenance of the electrical system

16  and components for the Monorail for ten years."  (Resp. (Dkt. # 180) at 13-14.)  The

17  court agrees that the text of Federal Rule of Evidence 702 expressly contemplates that an

18  expert may be qualified on the basis of experience.  *See* Fed. R. Evid. 702.  Further, the

19  Committee Notes on the 2000 Amendments to Federal Rule of Evidence 702 state that

20  "[n]othing in this amendment is intended to suggest that experience alone—or experience

21  in conjunction with other knowledge, skill, training or education—may not provide a

22  sufficient foundation for expert testimony."  Fed. R. Civ. P. 702, Advisory Committee

ORDER- 11

1   Notes, 2000 Amendments ("Rule 702 expressly contemplates that an expert may be

2   qualified on the basis of experience.  In certain fields, experience is the predominant, if

3   not sole, basis for a great deal of reliable expert testimony.").

4        If the level of Mr. Rongren's qualifications were the only basis of LTK's

5   challenge to his expert testimony, then LTK's motion might well fail.  The Advisory

6   Committee Notes to Rule 702, however, go onto state that "[i]f the witness is relying

7   solely or primarily on experience, then the witness must explain how that experience

8   leads to the conclusion reached, why that experience is a sufficient basis for the opinion,

9   and how that experience is reliably applied to the facts."  *Id.*; *see also United States v.*

10  *Hermanek*, 289 F.3d 1076, 1096 (9th Cir. 2002) (citing Rule 702 Advisory Committee

11  Notes in requiring expert relying on experience to explain his methodology).  It is with

12  respect to this requirement that AFM's advocacy for Mr. Rongren's expert testimony

13  stumbles.  LTK has not relied simply on criticism of Mr. Rongren's qualifications, but

14  has also points to testimony in which Mr. Rongren expressly disclaims any qualification

15  for opining as to the actual configuration of the grounding system for the Monorail.

16  Specifically, Mr. Rongren has testified as follows:

17     Q:  Were you made aware that you have been designated as a nonretained
      expert witness in this case?

18

19     A:  No.

                   \*\*\*\*\*\*\*\*\*\*

20

21     Q:  Showing you . . . [AFM's] Expert Disclosure submitted in this case, it is
      a statement attributed to you that states you were in charge of maintenance
      for the Seattle Monorail on behalf of King County Metro from 1986 until

22     1994 when [SMS] took over.  Is that a true statement?

A:  I agree with that.

Q:  It indicates, "Mr. Rongren is familiar with the original design of the train body grounding system for the Seattle Monorail."  Do you see that statement?

A:  Yes.

Q:  Would you agree with me that your familiarity with the purported original design is limited to what you believe was shown or depicted in the original design documents?

A:  Correct.

Q:  But whether or not that configuration was actually installed in conformance with those design documents is something which you have no information on, correct?

A:  Correct.

Q:  Would it be fair to state that although you have some familiarity with the original design intent of the grounding system, you don't have any understanding nor would you believe you would be qualified to testify to as the actual configuration and existence of the grounding system for the Seattle Monorail at the time it was constructed up through the point in time . . . Metro left . . . in 1994?

A:  Correct.

(Pierson Decl. (Dkt. # 178) Ex. E (Rongren Dep.) at 137:15-139:9.)

In addition to the foregoing testimony, Mr. Rongren offered other testimony which confirms that (1) he bases his opinion that the Monorail utilized a floating and not bonded grounding system primarily upon his review of the Monorail's original drawings years after his tenure at King County Metro was over and (2) he never undertook any investigation during his tenure at King County Metro with respect to the actual configuration of the Monorail's grounding system:

ORDER- 13

Q:  So when you state your opinion that the monorail high voltage negative should not be bonded to the car body, you're referencing your understanding from a review of the original drawings, is that correct?

A:  Yes.

Q:  Anything else?

A:  I recall that the negative collector frames, the items that hold the carbons that contact the rail, were insulated to begin with.  So I couldn't see a reason why they would not just mount that directly to the body, which would in turn bond itself.

It was my recollection or my knowledge from the busses that we tried to isolate traction power from the body in all manners that we could.  I figured this was nothing but a bus on a rail.

Q:  So your statement was predicated on your understanding of the manner in which grounding is accomplished on trolley busses and you essentially likened the monorail to such a vehicle, correct?

A:  Correct.

Q:  And you inferred from your review of the original drawings that that was the original design intent?  Is that a fair statement?

A:  That's a fair statement.

Q:  But you would agree with me that you had done no investigation or made a determination at any point in time prior to August 5 of 2002 as to how the grounding system was actually configured on the Seattle Monorail vehicle at prior points in time.  True Statement?

A:  Except for looking at prints, that's a true statement.

Q:  So it would have been limited to your review of drawings as to what was showing for the design intent as to what the configuration was for the monorail vehicle?  That's what you reflected, correct?

A:  Correct.

Q:  But you did not undertake an investigation of the actual configuration of the wiring from all of the various electrical components and points of

ORDER- 14

contact to determine how, in fact, the grounding system existed on the Seattle Monorail prior to August 5, 2002; correct?

A:  Correct.

Q:  As of August 5, 2002, you had no understanding or opinion as to how, in fact, the grounding system for the monorail existed at prior points in time prior to August 5, 2002.  True statement?

A:  True statement.

(Rongren Dep. at 95:9-97:5.)

Although AFM insists in its response to LTK's motion that Mr. Rongren's experience qualifies him as an expert witness, AFM never addresses in any way the foregoing testimony in which Mr. Rongren explicitly disavows any investigation of, expert qualification for, or opinion as to the Monorail's actual grounding system.  (*See generally* Resp.)  Although it is clear that Mr. Rongren believes based on his review of the Monorail's original drawings that the Seattle Monorail employed a floating grounding system (Rongren Dep. at 139:10-24), whether Mr. Rongren is qualified as an expert based on his experience as a maintenance manager at King County Metro to interpret the type of grounding system depicted in the Monorail's original drawings is not an issue before the court because this is not the purpose for which AFM designated him as an expert witness.  AFM designated Mr. Rongren as an expert who would "testify that the Seattle Monorail employed a 'floating' grounding system during his entire career working on the Monorail for Metro."  (AFM's 2d Expert Disclosures at 2-3.)  Mr. Rongren is not qualified to testify as an expert as to the Monorail's actual grounding system during that period of time—particularly in light of his unequivocal repudiation of

ORDER- 15

1   any investigation into, expert qualification for, or opinion on the issue.  Accordingly, the

2   court grants LTK's motion to exclude expert testimony from Mr. Rongren concerning the

3   actual grounding configuration of the Monorail.

4         The court notes, however, that even if Mr. Rongren is not qualified to testify on

5   the topic for which AFM's counsel designated him as an expert witness, he may have

6   other relevant factual testimony to offer with respect to the parties' dispute.  The court

7   has not been asked to rule on the admissibility of Mr. Rongren's testimony as a fact

8   witness and nothing in this order should be construed as doing so.

9   **C. John Dexter**

10        AFM designated Mr. Dexter as an expert witness "to present evidence under

11   [Federal Rule of Evidence] 702, 703, or 705."  (AFM's 2d Expert Disclosures at 1, 4-5.)

12   If the expert witness is not required to provide a written report, then absent a stipulation

13   or court order, Federal Rule of Civil Procedure 26(a)(2)(C) requires a party's expert

14   witness disclosure to state "the subject matter on which the witness is expected to present

15   evidence under Federal Rule of Evidence 702, 703, or 705" and "a summary of the facts

16   and opinions to which the witness is expected to testify."  Fed. R. Civ. P. 26(a)(2)(C)(i),

17   (ii).  AFM's disclosure concerning Mr. Dexter stated, in total, as follows:

18
19
20
> Mr. Dexter was retained by Seattle Monorail Services prepare [sic] a fire
> safety assessment for the Seattle Monorail after the fire for submission to
> the Washington State Department of Transportation in order to allow the
> Seattle Monorail to resume operation.  Mr. Dexter's opinions and the bases
> for them are contained in the Final Safety Assessment Report dated March
> 29, 2005.

21

22   (AFM's 2d Expert Disclosures at 4-5.)

1        AFM has moved to exclude Mr. Dexter as an expert witness on grounds that

2  during his deposition Mr. Dexter acknowledged that he had no basis for testifying as an

3  expert regarding any of the material contained in the Final Safety Assessment or Fire

4  Safety Assessment ("FSA").[4]  (Mot. at 5-9.)  Mr. Dexter was deposed on February 3,

5  2014.  (Pierson Decl. Ex. F (Dexter Dep.) at 1.)  The FSA was entered as Exhibit 1 to Mr.

6  Dexter's deposition.  (*Id.* at 9:23-10:7.)  The FSA was a document prepared by Booz

7  Allen following the fire on the Monorail.  (*See* Mot. Ex. A1 (attaching copy of FSA) at

8  ES-ii.)  The FSA sets forth 22 recommendations to reduce the risks of fire hazard on the

9  Monorail.  (*See generally* Mot. Ex. A1 at 4-5 - 4-6.)  AFM is claiming as damages in this

10  litigation the cost to implement those 22 recommendations.  (Wahtola Decl. (Dkt. # 52)

11  Ex. 5 (AFM's Ans. to LTK's Int.) at 9 (Int. No. 15) ("Cost to comply with WSDOT

12  mandated Fire Safety Assessment").)

13        During his deposition, Mr. Dexter testified that he did not perform any of the

14  analysis in the FSA report or participate in its actual drafting:

15      Q:  . . . . Were you not one of the people that performed the fire safety
        analysis?

16

17      A:  No, I was not.  I thought we were clear on that.  No.

      Q:  Okay.  No, I was not clear, so I misunderstood.

18

19

20       [4] LTK asserts that the FSA is known both as the Final Safety Assessment (which is how
    AFM characterized the report in its expert disclosures (*see* AFM's 2d Expert Disclosures at 5))

21  and the Fire Safety Assessment (which is the title of the document attached as Exhibit 1 to Mr.
    Dexter's deposition (Mot. at 5, Ex. A1)).  LTK does not dispute this contention and in fact also

22  refers to the report as the "Fire Safety Assessment" in its responsive memorandum.  (Resp. at
    16.)

1   A:  Okay.  No, we had at the time, Booz Allen had at the time, a team of
2   people whose job was to perform fire safety analyses, not only on transit
    systems, but on a variety of things.  Maybe NASA, I don't know.

3   Q: Okay.

4   A:  So they're sitting at their computers in a room in New Jersey
    somewhere doing all this analysis.  Part of the stuff that they had done was
5   transit oriented, so there was a knowledge base, but they performed the
    analysis without a whole lot of help from me.

6
                              **********
7
8   Q:  Okay.  So you don't know why certain items are listed as potential
    hazards and why other items were excluded, correct?

9   A:  In the process of going through all this and reviewing it with the guys
    who did this analysis, there was a point in time when I understood that, all
10  the stuff, but it's not today.

11  Q: Okay.

12  A: I no longer remember.

13  Q:  That's fair enough.  That's fair enough. . . . . So then what was your
    role—maybe you could more specifically describe for me, and that might
14  help me truncate my questioning here, what you specifically did in terms of
    preparing this FSA report.
15
16  A:  From a technical standpoint—well, I guess from any standpoint, really,
    not very much.  My role throughout this process was more of a project
    manager than a technical guru.  And so my role as far as the FSA is
17  concerned was to find the right people within Booz Allen to do the work.

18                            **********

19  Q:  . . . Did you have any role in drafting or preparing any of the text that
    we see on any of the pages in this FSA?
20
    A:  That's unlikely.  I don't recall, but it's unlikely.
21
    Q:  Okay.  So your role was more of just making sure this got done and
22  getting the right people to get on board to do it, right?

ORDER- 18

1    A:  That's correct.

2  (Dexter Dep. at 61:24-64:23.)

3    As Mr. Dexter explained in another portion of his deposition, he did not perform

4  any work related to fire safety engineering while he worked at Booz Allen, either before

5  or during the Monorail project:

6    Q:  While you were at Booz Allen prior to your work on the Seattle
7    Monorail project, did you do any work related to fire safety engineering?

8    A:  No, nor did I on this project personally.  There were others in Booz
   Allen who actually performed the fire safety analysis who were well-known
9    experts in the field.

10  (*Id.* at 17:6-12.)

11    Mr. Dexter's testimony also confirms that any opinions he has concerning the

12  FSA's recommendations are speculative at best and do not have a reliable basis sufficient

13  for admission under Federal Rule of Evidence 702.  He testified as follows:

14    Q:  . . . [D]o you have any opinions regarding the necessity of any of the
   items in [the FSA], you personally, not Booz Allen?

15
   A:  I don't recall at any point saying to myself, This is a dumb idea, we
16    shouldn't be doing this.

17    Q:  Okay.

18    A:  Or answering your question directly, at the time I believed that all of
   this was needed.

19
   Q:  Okay.  What was that based on?

20
   A:  Based—well, in part intuition, in part logic, and in part faith in the
21    work—faith in the work done by the FSA guys.

22    Q:  Okay.  But you were not involved in that work, correct?

ORDER- 19

1  A:  Not directly, that's right.  I mean, I didn't sit down and do the—I didn't
2  . . . I didn't perform the analysis.

3  Q:   Okay.   An you also did not have any—you were not an electrical
   engineer either, correct?

4

5  A:  That's correct.

(*Id.* at 65:19-66:18.)

6

7  Finally, Mr. Dexter unequivocally agreed that he was not qualified to render an

opinion regarding the recommendations in the FSA report:

8

9  Q:  . . . Mr. Dexter, you just explained to me that you really didn't have any
   part at all in preparing this [FSA] report.  Is it correct that this report
   contains your opinions?

10

11 A:  You're asking tough questions.

12 Q:   I'm sorry, I'm really not trying to, but I am trying to get an
   understanding here.

13 A:   Well, and I'm trying to answer.  I think it's fair to say that what is
   contained in [the FSA] report made sense to me at the time and probably
14 still would make sense to me today.

15 That's—if you want to call it an opinion, then my opinion would be that
   that is—that that report contains good quality work top to bottom.

16

17 That's not the same as having the technical expertise to state with
   conviction that some of the specific details of the recommendations are the
   one and only appropriate response.

18

19 Q:  Okay.  And so you would agree with me that you don't have the
   technical expertise or experience to opine as to the specific technical
   recommendations in this report, correct?

20

21 A:  I think that's correct, yeah.

22 Q:  Okay.

ORDER- 20

1   A:  From—you did say technical, right, I don't have the technical—yeah,
    yeah, clearly that's true.

2   (*Id.* at 67:15-68:15.)

3

4   Based on the foregoing testimony, the court would be hard pressed to find Mr.

5   Dexter qualified to testify as an expert under Federal Rule of Evidence 702 pursuant to

6   the description provided in AFM's expert witness disclosure.  AFM's disclosure

7   specifically states that "Mr. Dexter's opinions and the bases for them are contained in the

8   Final Safety Assessment Report dated March 29, 2005."  (AFM's 2d Expert Disclosures

9   at 5.)  Mr. Dexter has expressly disavowed that he performed any of the analysis

10  contained in the FSA report, he has acknowledged that he lacks the technical expertise or

11  experience to opine concerning the recommendations contained in the report, and to the

12  extent the report contains his opinions, he has acknowledged that such opinions are based

13  at least in part on his "intuition" and "faith" in work done by others.  This testimony falls

14  woefully short of the standards set forth in Rule 702 that an expert's scientific and

15  technical knowledge "will help the trier of fact to understand the evidence," that the

16  expert's testimony "is based on sufficient facts and data," that the expert's testimony "is

17  the product of reliable principles and methods" (as opposed to intuition and faith), and

18  that "the expert has reliably applied the principles and methods to the facts of the case."

19  Fed. R. Evid. 702(a), (b), (c), (d).

20  AFM does not dispute any of the foregoing testimony.  (*See generally* Resp.)

21  Instead, AFM asserts in response that LTK "misapprehends the nature and import of Mr.

22  Dexter's proffered testimony."  (Resp. at 17.)  AFM asserts that it is "not offering Mr.

1    Dexter's testimony to necessarily proof [sic] the truth of what is specifically contained in

2    the FSA report," but rather "is offering Mr. Dexter's testimony to demonstrate that [the

3    Washington State Department of Transportation ("WSDOT")] would not allow the

4    Monorail back into revenue service until the FSA report was completed and accepted by

5    WSDOT, that a recognized and accepted methodology for preparing the FSA was

6    followed, that the FSA was prepared and submitted to the WSDOT for acceptance, and in

7    fact it was accepted by WSDOT." (*Id.*)  AFM asserts that "Mr. Dexter's testimony

8    provides the proper foundation for the introduction of testimony with respect to how

9    much it cost to complete all of the work called for by the FSA and in fact which was

10   completed by SMS in order receive [sic] approval from the WSDOT to place the

11   Monorail back in revenue service." (*Id.*)  Thus, AFM now states that Mr. Dexter's

12   testimony is being offered to show that the FSA report "was completed as required by

13   WSDOT and accepted by WSDOT as satisfactory." (*Id.* at 17-18.)  Unfortunately, as

14   detailed above, this is not how AFM described Mr. Dexter's proffered expert testimony

15   in its expert witness disclosure.

16          In its reply memorandum, LTK asserts that AFM should be barred from presenting

17   these new "eleventh hour" opinions delineated for the first time in AFM's response to

18   LTK's motion to exclude Mr. Dexter's expert testimony.  (Dexter Reply (Dkt. # 184) at

19   4-5.)  Federal Rule of Civil Procedure 26(a)((2)(D) requires parties to make their expert

20   witness disclosures "at the times and in the sequence that the court orders."  Fed. R. Civ.

21   P. 26(a)(2)(D).  Here, the parties' deadline for disclosing expert testimony was November

22   6, 2013.  (Sched. Ord. (Dkt. # 150) at 1.)  Thus, there is no question that AFM's

1 disclosure of additional areas of expert testimony in its response memorandum is late

2 under Rule 26(a)(2)(D).

3        Rule 26(e) permits supplementation of an expert report "in a timely manner if the

4 party learns that in some material respect the disclosure . . . is incomplete or

5 incorrect . . . ." Fed. R. Civ. P. 26(e)(1)(A). The supplementation rule, however, is not

6 intended to allow parties to add new opinions to an expert disclosure based on evidence

7 that was available to them at the time the initial disclosure was due. The duty to

8 supplement does not give license to surprise one's opponent with issues which should

9 have been included in the expert witness disclosure. *See Reinsdorf v. Sketchers U.S.A.*,

10 922 F. Supp. 2d 866, 880 (C.D. Cal. 2013); *see also Metro Ford Truck Sales, Inc. v. Ford*

11 *Motor Co.*, 145 F.3d 320, 324 (5th Cir. 1998) ("The purpose of supplementary

12 disclosures is just that—to supplement. Such disclosures are not intended to provide an

13 extension of the expert designation and report production deadline.") (footnote omitted);

14 *Toomey v. Nextel Commc'ns, Inc.*, 2004 WL 5512967, *4 (N.D. Cal. Sept. 23, 2004)

15 ("The supplementation requirement of Rule 26(e)(1) is not intended, however, to permit

16 parties to add new opinions to an expert report based on evidence that was available to

17 them at the time the initial expert report was due."); *Akeva L.L.C. v. Mizuno Corp.*, 212

18 F.R.D. 306, 310 (M.D.N.C. 2002) ("To construe supplementation to apply whenever a

19 party wants to bolster or submit additional expert opinions would [wreak] havoc in

20 docket control and amount to unlimited expert preparation"); *Keener v. United States*,

21 181 F.R.D. 639, 640 (D. Mont. 1998) ("Supplementation under the Rules means

22

ORDER- 23

1    correcting inaccuracies, or filling the interstices of an incomplete report based on

2    information that was not available at the time of the initial disclosure").

3         AFM never explains why it failed to include the topics described in its responsive

4    memorandum to LTK's motion in its original expert designation.  The court can discern

5    no reason why these topics could not have been included in AFM's original designation.

6    As such, the court cannot find that AFM's responsive memorandum constitutes a timely

7    "supplementation" of its expert witness designation under Rule 26(e).

8         Federal Rule of Civil Procedure 37(c) authorizes the imposition of sanctions

9    against a party who fails to identify a witness or to provide information as required under

10   Federal Rule of Civil Procedure 26(a) or (e).  Fed. R. Civ. P. 37(c).  In general, the Rule

11   provides that "[i]f a party fails to provide information or identify a witness as required by

12   Rule 26(a) or (e), the party is not allowed to use that information or witness to supply

13   evidence on a motion, at a hearing, or at a trial, unless the failure was substantially

14   justified or harmless."  Fed. R. Civ. P. 37(c)(1).  In addition, Rule 37(c) provides that as

15   an addition or substitute for this sanction, "the court, on motion and after giving an

16   opportunity to be heard . . . (A) may order payment of the reasonable expenses, including

17   attorney's fees, caused by the failure; (B) may inform the jury of the party's failure; and

18   (C) may impose other appropriate sanctions, including any of the orders listed in Rule

19   37(b)(2)(A)(i)-(vi)."[5]  Fed. R. Civ. P. 37(c)(1)(A), (B), (C).

20

21        [5] The orders listed in Rule 37(b)(2)(A)(i)-(vi) include:  "(i) directing that the matters

22   embraced in the order or other designated facts be taken as established for purposes of the action,
     as the prevailing party claims; (ii) prohibiting the disobedient party from supporting or opposing

1    The only sanction that LTK has requested is the exclusion of Mr. Dexter's

2    testimony regarding any of the new opinions set forth in AFM's response memorandum.

3    (Dexter Reply at 4-5.)  Because it is a harsh sanction, it need not be applied if AFM's

4    failure to timely disclose was "substantially justified or harmless."  Fed. R. Civ. P.

5    37(c)(1).  Unfortunately, AFM offers no excuse for its failure to include the topics

6    identified in its response memorandum for Mr. Dexter's expert testimony in its original

7    expert designation.  (*See generally* Resp.)  Instead, AFM merely asserts that LTK

8    "misapprehend[ed] the nature and import of Mr. Dexter's proffered testimony."  (Resp. at

9    17.)  The court, however, has reviewed AFM's expert designation and agrees with LTK

10   that the topics AFM proffers in its response memorandum for Mr. Dexter's expert

11   testimony were not previously identified in AFM's expert disclosure for Mr. Dexter.  Nor

12   is it obvious from the context of the designation that AFM was proffering Mr. Dexter's

13   expert testimony concerning the FSA report as "germane" to the issue of damages, but

14   not liability or causation.  (*See* Resp. at 18.)  Thus, there is no basis upon which the court

15   could find that the untimeliness of AFM's modification of Mr. Dexter's expert witness

16   designation was substantially justified.

17        Neither can the court conclude that AFM's tardy disclosure of the subject matter

18   upon which AFM expected Mr. Dexter to provide expert testimony under Rules 702, 703

19   

20   designated claims or defenses, or from introducing designated matters in evidence; (iii) striking
pleadings in whole or in part; (iv) staying further proceedings until the order is obeyed; (v)

21   dismissing the action or proceeding in whole or in part; (vi) rendering a default judgment against
the disobedient party; or (vii) treating as contempt of court the failure to obey any order except

22   an order to submit to a physical or mental examination."  Fed. R. Civ. P. 37(b)(2)(A)(i)-(vi).

1  or 705 was harmless.[6]  AFM filed its expert witness disclosure on November 6, 2013.

2  (*See* AFM's 2d Expert Disclosure.)  LTK took Mr. Dexter's deposition on February 3,

3  2014 (*see* Pierson Decl. Ex. F (attaching Dexter Dep.) at 1), and discovery closed on

4  February 7, 2014 (*see* Min. Entry (Dkt. # 167)).  LTK prepared for and conducted expert

5  depositions based on AFM's disclosure and has prepared for trial based in part on the

6  depositions of those expert witnesses.  Trial in this case is scheduled for May 5, 2014—

7  just weeks from now.  Permitting AFM this late modification to its disclosure regarding

8  the subject matter of Mr. Dexter's expert testimony, contained within its February 24,

9  2014, responsive memorandum to LTK's motion to exclude Mr. Dexter's expert

10  testimony, could conceivably impact the trial date which would not be harmless for

11  purposes of Rule 37(c).  *See Wong v. Regents of the Univv. of Cal.*, 410 F.3d 1052, 1062

12  (9th Cir. 2005).  When a party fails to identify expert witnesses, and provide the

13  disclosures required by Rule 26(a)(2) in accordance with the court's scheduling order,

14  "[d]isruption to the schedule of the court and other parties in that manner is not

15  harmless."  *Id.*  Moreover, the untimeliness of AFM's disclosure has caused LTK to incur

16  attorney's fees in futilely taking the deposition of Mr. Dexter on topics that were

17  described in AFM's expert witness disclosure, but that AFM now asserts are not

18  "germane" to the case.  (*See* Resp. at 17-18.)  Finally, LTK has incurred expenses and

19  attorney's fees in filing the present motion.  The present motion either would not have

20

21  ─────────────────

22  [6] The Ninth Circuit Court of Appeals has held that the burden of proving harmlessness is on the party facing sanctions. *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1107 (9th Cir. 2001).  Thus, the burden falls on AFM.

1  been filed had AFM timely disclosed the subject matter on which it expected Mr. Dexter

2  to present evidence or it would have been filed in substantially different form.  *See*

3  *generally Bixby v. KBR, Inc.*, 282 F.R.D. 521, 531 (D. Or. 2011).  The court, therefore,

4  cannot conclude that AFM's untimely disclosure was harmless.  Accordingly, the court

5  finds that sanctions are appropriate here.

6      As discussed above, under Rule 37(c)(1), it is within the court's discretion to

7  exclude Mr. Dexter's expert testimony on the late disclosed subject matter or, "[i]n

8  addition to or instead of this sanction," to impose alternative sanctions.  Fed. R. Civ. P.

9  37(c)(1).  Exclusion is the "self-executing" or "automatic" sanction contemplated under

10  Rule 37(c).  *See Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th

11  Cir. 2001) (citing Fed. R. Civ. P. 37 advisory committee's note (1993)).  Other circuit

12  courts have ruled that the exclusion sanction is an extreme remedy "not normally to be

13  imposed absent a showing of willful deception or flagrant disregard of a court order by

14  the proponent of the [untimely proffered] evidence."  *See, e.g.*, *In re Paoli R.R. Yard PCB*

15  *Litig.*, 35 F.3d 717, 792 (3d Cir. 1994).  The Ninth Circuit, however, is not one of them

16  and has declined to adopt any such prerequisite.  *See, e.g., Quevedo v. Trans–Pacific*

17  *Shipping*, 143 F.3d 1255, 1258 (9th Cir. 1998), *Wong*, 410 F.3d at 1061-62.  Indeed, the

18  Ninth Circuit has expressly opined that the exclusion sanction, although concededly

19  "onerous," may be appropriately imposed under Rule 37(c) in the absence of any

20  willfulness, fault, or bad faith on the part of the dilatory party, even where its imposition

21  may render it difficult or impossible for that party to prove his or her case. *Yeti by Molly*,

22  259 F.3d at 1106.

ORDER- 27

1      Here, the court finds exclusion of the Mr. Dexter as an expert witness with respect

2  to the additional subject matters identified in AFM's response to LTK's motion to be the

3  appropriate remedy.  In so ruling, however, the court notes that some of the testimony

4  that AFM describes in its response to LTK's motion may be based not on Mr. Dexter's

5  expertise in any particular area, but simply on his perception of events as they unfolded

6  with respect to the FSA report.  In other words, apart from AFM's designation of Mr.

7  Dexter as an expert witness, Mr. Dexter may simply have factual testimony to offer that

8  is relevant to the parties' dispute.  The court has not been asked to rule on the

9  admissibility of Mr. Dexter's testimony as a fact witness in this matter and nothing in this

10  order should be construed as doing so.[7]

11      In sum, the court grants LTK's motion to exclude the expert testimony of Mr.

12  Dexter on the subject matter identified in AFM's expert disclosure—namely the contents

13  of the FSA report.  Mr. Dexter acknowledged during the course of his deposition that he

14  did not participate in actually drafting the report, did not perform any of the analysis in

15  the report, lacks the technical expertise or experience to opine concerning the

16  recommendations contained in the report, and to the extent the report contains his

17  opinions, lacks a sufficiently reliable basis for admission of those opinions under Rule

18  702.  In addition, the court declines to permit AFM to untimely disclose additional

19  _____

20      [7] During the April 15, 2014, hearing, the court authorized the parties to bring an additional motion in limine concerning factual testimony offered by Mr. Rongren and Mr.

21  Dexter, if appropriate.  Any such motion concerning these witnesses should be combined, limited to five pages, and filed no later than April 23, 2014.  Any responsive memorandum should be

22  likewise limited to five pages and filed no later than April 30.  The court will not entertain a reply memorandum.

1  subject matters with respect to Mr. Dexter's expert testimony in its response to LTK's

2  motion and excludes any expert testimony from Mr. Dexter on these topics as well.  In so

3  ruling, however, the court expressly does not rule on whether Mr. Dexter could testify as

4  a fact witness with respect to portions of the subject matter described in AFM's

5  responsive memorandum.

6                          **IV.    CONCLUSION**

7          Based on the foregoing, the court GRANTS in part and DENIES in part LTK's

8  motion with respect to Mr. Way (Dkt. # 174), and GRANTS LTK's motions with respect

9  to Mr. Rongren, and Mr. Dexter (Dkt. ## 175, 176).  The court notes, however, that its

10 order today with respect to Mr. Rongren and Mr. Dexter is directed solely to their

11 proposed testimonies as expert witnesses and is not to be construed as ruling on any

12 relevant testimony that either of these individuals may have to offer simply as fact

13 witnesses.

14         Dated this 16th day of April, 2014.

15

16

17         _____

18         JAMES L. ROBART
           United States District Judge

19

20

21

22

ORDER- 29