1

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10

AFFILIATED FM INSURANCE CO.,

CASE NO. C06-1750JLR

11

Plaintiff,

ORDER DENYING
DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT

12

v.

13

LTK CONSULTING SERVICES,
INC.,

14

Defendant.

15

## I.    INTRODUCTION

16

17

Before the court is Defendant LTK Consulting Services, Inc.'s ("LTK") motion

for summary judgment (Dkt. # 172).  Two of the arguments LTK raises in its present

18

motion are variations of arguments that LTK has previously raised, including that (1) the

19

factual allegations in that Plaintiff Affiliated FM Insurance Co.'s ("AFM") complaint are

20

false, and (2) AFM's claims are barred by the statue of limitations,.  (Compare Mot. (Dkt.

21

# 172) with 5/1/12 Mot. (Dkt. # 80).)  The remaining arguments LTK raises on summary

22

1  judgment are that AFM failed to mitigate its damages and assumed the risk at issue.

2  (Mot. at 21-24.)  The court has reviewed LTK's motion, all submissions filed in support

3  of and opposition thereto, the balance of the record, and the applicable law.[1]  Being fully

4  advised, the court DENIES LTK's motion.

5                          **II.    BACKGROUND**

6         This action arises out of a fire that occurred on May 31, 2004, that damaged the

7  Blue and Red Trains of the Seattle Monorail as the Blue Train was leaving the Seattle

8  Center Station.  (*See* Not. of Rem. (Dkt. # 1) at 7-11 (Compl. ¶¶ 1.1, 3.2).)  Plaintiff

9  Affiliated FM Insurance Company ("AFM") paid its insured, Seattle Monorail System

10  ("SMS"), $3,267,861.00 for damages resulting from the fire.  (*Id.* ¶ 5.1.)  AFM, as the

11  equitable and contractual subrogee of SMS, brings this action against LTK, which

12  provided certain engineer services related to the Monorail, to recover damages associated

13  with the May 31, 2004, fire.  (*Id.*)  In its complaint, AFM alleges:

> In 2001, the City of Seattle contracted with . . . LTK . . . to refurbish the
> [SMS].  As part of this refurbishment, LTK . . . recommended that the
> grounding system for the Blue and Red Trains that made up the [SMS]
> be changed.  This change to the grounding system for the Blue and Red
> Trains was completed in 2002.

17  (*Id.* ¶ 3.1.)  AFM further alleges that "[t]he electrical ground fault responsible for causing

18  the fire in the Blue Train on May 31, 2004 would have been avoided if the electrical

21      [1] Counsel for both LTK and AFM were offered the opportunity to provide the court with
22  oral argument concerning this motion on April 15, 2014.  Both sides informed the court that they
    waived the opportunity with respect to this motion.

ORDER- 2

1   grounding system for the Blue Train had not been changed at the direction of LTK . . . in

2   2002." (*Id.* ¶ 3.3.)

3        AFM provides evidence that the original 1961 design of the Monorail employed a

4   "floating" grounding system, which is a system in which the ground is not actually

5   connected to the earth or another circuit ground. (5/21/12 Way Decl. (Dkt. # 95) ¶¶ 3, 6.)

6   Because car bodies of the Monorail were "floating" or electrically isolated, the metal car

7   bodies did not carry current. (*Id.* ¶ 6.)

8        During the course of discovery in this action, AFM responded to a contention

9   interrogatory from LTK by indicating that the City of Seattle had contracted with LTK in

10  1997 to provide engineering services related to the SMS. (*See* 3/30/12 Wahtola Decl.

11  (Dkt. # 52, 62) ¶ 25, Ex. 5 (attaching AFM's Ans. to Int. No. 4).) In addition, despite the

12  allegations in its complaint that LTK recommended changing the Monorail's grounding

13  system in 2002, AFM stated in its discovery response and elsewhere that it was during

14  the course of this earlier project in 1997 or 1998 that LTK initially redesigned the

15  Monorail's grounding system from a floating to a "body ground to negative rail"

16  grounding system, also known as a "grounded" or "bonded" grounding system. (*See id.*

17  ¶ 25, Ex. 5; 5/21/12 Way Decl. ¶ 7(c).)

18       Part of the evidence at issue arises out of the 2005 insurance coverage suit

19  between AFM and SMS. The insurance coverage lawsuit arose out of a dispute over

20  certain costs SMS claimed were related to the fire and covered by its insurance through

21  AFM. (*See id.* ¶ 18.) During the course of the coverage suit, counsel for AFM deposed

22

1   the manager of operations and maintenance for SMS, Mr. Glenn Barney.[2]  (*See id.* ¶¶ 39-

2   42.)  In response to direct questioning from AFM's counsel, Mr. Barney testified that

3   LTK did not recommend changing the electrical grounding system during 2002, but

4   rather recommended "keeping the ground bond between the car body and the negative

5   rail."  (*Id.* Ex. 12 (attaching 12/8/05 Barney Dep. at 137:24-138:22).)  In other words, in

6   2002, LTK recommended maintaining the bonded grounding system that LTK had

7   apparently redesigned from a floating system to a bonded system in 1998.

8          LTK points out that AFM filed the present complaint within approximately one

9   year of Mr. Barney's deposition in the insurance coverage lawsuit.  (Mot. at 3.)  LTK

10  emphasizes that the sole basis for AFM's claim against LTK is the allegation that LTK

11  recommended changing the grounding system for the Blue Train pursuant to LTK's 2001

12  contract to refurbish the Monorail and that the fire would not have occurred if LTK's

13  recommended "change" to the grounding system had not been implemented in 2002.  (*Id.*

14  (citing Compl. ¶¶ 3.1, 3.3, 4.2).)  LTK complains that the allegations in the complaint are

15  contrary to the testimony of Mr. Barney in both the underlying insurance coverage

16  lawsuit referenced above and more recently in the present lawsuit that LTK did not

17  recommend a change in the Monorail's grounding system in 2002.  (Mot. at 3-4 (citing

18  4/20/12 Wahtola Decl. (Dkt. # 76) Ex. 1 (attaching 4/10/12 Barney Dep. at 59:19-60:25;

19  196:1-197:3 (explaining that the Monorail's grounding system could not have been

20  _____

21       [2] In September 1998, Mr. Barney was hired to serve as the maintenance manager for
     SMS and he held that position until 2001 when he became the general manager responsible for
     overseeing the operations and maintenance of the Monorail.  (3/30/12 Wahtola Decl. Ex. 12
22  (attaching 12/8/05 Barney Dep. at 14:8-15:5).)

1 changed in 2002 from a floating to a bonded system based on LTK's recommendation

2 because it was already bonded at that time)).)

3       In late 1998 or early 1999, Mr. Barney became aware that members of the SMS

4 maintenance staff were experiencing electrical shocks while working on the Monorail

5 and there had been instances of electrical "arcing" occurring between the vehicle car

6 body and the station.  (*Id.* at 80:6-82:25; 126:9-127:11.)  As a result of these events, Mr.

7 Barney began investigating why the shocks and electrical arcing were occurring.  (*Id.*)

8 As a result of the investigation, Mr. Barney learned as early as March 2000 that the

9 electrical grounding system for the Monorail was "grounded" or "bonded" rather than

10 "floating."  (*Id.*)

11       SMS was required to "maintain" and "repair" the Monorail pursuant to its

12 Concession Agreement with the City of Seattle.  (*See id.* at 40:15-41:18, 92:19-93:5.)  On

13 October 6, 2000, LTK issued a proposal to the City of Seattle to provide services in

14 connection with a Monorail renovation project that included a survey of the Monorail

15 vehicles to document the existing grounding system.  (*Id.* at 49:10-51:11.)  SMS was to

16 provide the funds to pay for LTK's services.  (*Id.* at 47:22-51:11.)  The City accepted

17 LTK's proposal.  (*See* 5/1/12 Wahtola Decl. Ex. 3.)  Mr. Barney, however, voiced

18 concerns about whether the work LTK proposed to perform was appropriate to correct

19 the problems previously identified by SMS relating to the electrical grounding systems.

20 (4/20/12 Wahtola Decl. Ex. 1 (attaching 4/10/12 Barney Dep. at 52:7-54:7).)

21       On June 29, 2001, the Blue Train lost power after experiencing an incident of

22 electrical "arcing."  (*Id.* at 91:4-93:5.)  In addition, the Blue Train suffered property

1  damage in the form a one-inch by three-inch hole that was burned through the body of the

2  car.  (*Id.* at 90:21-91:10; 91:24-92:9.)  Shortly following the June 29, 2001, incident, Mr.

3  Barney wrote an incident investigation report.  (*Id.* at 90:7-91:19.)  In his report, Mr.

4  Barney identified, as a contributing factor to the incident, the fact that the electrical

5  grounding system of the SMS had been altered at some point in the past from a floating

6  to a bonded system.  (*See id.* at 93:6-25.)

7         On August 31, 2001, LTK issued a draft copy of its "Grounding and High Voltage

8  Auxiliary Survey" to Mr. Barney.  (4/20/12 Wahtola Decl. Ex. 1 (attaching 4/10/12

9  Barney Dep. at 94:8 – 95:19).)   In the survey, LTK specifically states that it is not

10  recommending that the existing bonded grounding system be returned to the original

11  floating design.  (*See* 5/1/12 Wahtola Decl. Ex. 8 at 3 ("We are not recommending the re-

12  installation of the original grounding system.").)  AFM asserts that LTK documented the

13  1997 change in the Monorail's grounding system in this survey without expressly

14  acknowledging LTK's role in the 1997 design change.  (*See* 3/30/12 Wahtola Decl. ¶ 25,

15  Ex. 5.)  Instead, LTK recommended replacing the multiple points of connection in which

16  the Monorail car bodies were bonded to the high voltage negative return systems with a

17  "single point of contact."  (5/1/12 Wahtola Decl. Ex. 8 at 3; *see id.* Ex. 10.)  LTK re-

18  routed all of the grounding connections on the Monorail, and reorganized the grounding

19  system, so that all of the grounded connections were run through a newly designed

20  terminal board.  (Way Decl. (Dkt. # 95) ¶ 10.)  This reorganization retained the bonded

21  grounding system, which LTK redesigned from its original configuration in 1998.  (*Id.*)

22  Thus, although LTK apparently reorganized the grounding system in 2001, the

ORDER- 6

1   Monorail's grounding system started out as "bonded" or "grounded" prior to LTK's 2001

2   recommendations and remained so after LTK's recommendations were implemented.

3   (4/20/12 Wahtola Decl. Ex. 1 (attaching 4/10/12 Barney Dep. at 196:1-197:3 ("[I]t was

4   grounded starting the project and it was grounded at the end of the project.").)

5       On March 10, 2002, Mr. Barney issued a letter to the City of Seattle objecting to

6   the work performed by LTK relating to the electrical grounding system.  (*Id.* at 109:22-

7   112:13); 5/1/12 Wahtola Decl. Ex. 12.)  In this letter, Mr. Barney refused to reimburse

8   the City of Seattle for LTK's services relating to the design of the electrical grounding

9   system on the basis that SMS deemed such services to be "unacceptable."  (5/1/12

10  Wahtola Decl. Ex. 12.)  Specifically, SMS objected to the fact that LTK failed to

11  "incorporate recommended changes to the [grounding] system."  (*Id.*)

12      On June 25, 2002, Mr. Barney wrote a letter to Ms. Stephanie Van Dyke of the

13  City of Seattle.  (*Id.* Ex. 17.)  In this letter, Mr. Barney stated that he did not believe that

14  LTK's services with respect to the Monorail's grounding system were performed

15  adequately.  (4/20/12 Wahtola Decl. Ex. 1 (attaching 4/10/12 Barney Dep. at 140:25 –

16  141:23).)  In particular, Mr. Barney explained that he did not believe that the bonded

17  grounding system as designed by LTK would prevent electrical "arcing" from burning

18  holes in the Monorail's car bodies or prevent electrical shocks to passengers or SMS

19  technicians.  (*See id.* at 141:24-142:25; *see also* 5/1/12 Wahtola Decl. Ex. 17.)  He also

20  stated that he believed that LTK had "misrepresented" what its design for the Monorail

21  grounding system would accomplish.  (5/1/12 Wahtola Decl. Ex. 17 ("While LTK  may

22  have performed the specific requirements of the Task Force for this project, it should be

ORDER- 7

1    noted for the future that LTK has fallen far short of meeting expectations that were

2    clearly presented by SMS, and misrepresented what it would achieve throughout the

3    course of the project.").)

4         On July 15, 2002, Mr. Barney, representing SMS, attended a meeting convened by

5    the City of Seattle for the specific purpose of discussing the Monorail's grounding system

6    as designed by LTK.  (4/20/12 Wahtola Decl. Ex. 1 (attaching 4/10/12 Barney Dep. at

7    146:13-147:15).)  At this meeting, Mr. Barney, on behalf of SMS, advocated for a

8    floating grounding system, while representatives of LTK and another electrical

9    engineering firm argued that the grounded or bonded system LTK had designed for the

10   Monorail should remain.  (*Id.* at 147:5-149:17; 152:22-153:4.)  As a result of the meeting,

11   the City of Seattle determined that the bonded grounding system designed by LTK would

12   remain in place.  (*See id.* at 156:18-157:16; 151:23-25.)

13        After the meeting on the same day, Mr. Barney issued a memorandum to the City

14   of Seattle, entitled "Notice of Agreement Termination," in which he stated that he was

15   terminating SMS's agreement to reimburse the City of Seattle for LTK's services.  (*See*

16   5/1/12 Wahtola Decl. Ex. 27; 4/20/12 Wahtola Decl. Ex. 1 (attaching 4/10/12 Barney

17   Dep.) at 160:19-163:3).)  Mr. Barney did not believe that SMS should be obligated to pay

18   for services that it deemed unacceptable.  (*Id.*)  He also believed that he should not have

19   to pay for LTK's services because the grounding system it recommended posed a safety

20   hazard to passengers and maintenance staff and would result in additional instances of

21   electrical arcing causing property damage to vehicles.  (*Id.*)

22

1    Despite Mr. Barney's July 15, 2002, "Notice of Agreement Termination" letter to

2    the City of Seattle, SMS eventually reimbursed the City of Seattle for the work

3    performed by LTK.  (*See* 2/13/14 Wahtola Decl. (Dkt. # 173) Ex. 53 (attaching letter

4    from Mr. Barney stating that "SMS is forwarding . . . final payment . . . based on

5    recognition that all work on this project . . . has now been completed.").)  SMS ultimately

6    reimbursed the City of Seattle for LTK's work despite SMS's belief that LTK performed

7    its services improperly and that the grounding system would continue to result in fire

8    damage and burning of Monorail vehicles by electrical arcing.  (4/20/12 Wahtola Decl.

9    Ex. 1 (attaching 4/10/12 Barney Dep. at 195:6-197:3); 5/1/12 Wahtola Decl. Ex. 28.)

10    LTK contends, based on the facts recited above, that it is entitle to summary

11    judgment on three grounds:  (1) that the facts alleged in the complaint are false (Mot. at

12    14-19), (2) that AFM's claims are barred by the statute of limitations (*id.* at 19-21), and

13    (3) that SMS failed to mitigate its damages and assumed the risks relating to the Monorail

14    grounding system (*id.* at 21-24).  The court addressed each argument in turn.

15    ## III.    ANALYSIS

16    ### A.  Standards on Summary Judgment

17    Federal Rule of Civil Procedure 56 permits a court to grant summary judgment

18    where the moving party demonstrates (1) the absence of a genuine issue of material fact

19    and (2) entitlement to judgment as a matter of law.  *See* Fed. R. Civ. P. 56; *Celotex Corp.*

20    *v. Catrett*, 477 U.S. 317, 322 (1986); *see also Galen v. Cnty. of L.A.*, 477 F.3d 652, 658

21    (9th Cir. 2007).  The moving party bears the initial burden of production of showing an

22    absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  If the moving

1  party does not bear the ultimate burden of persuasion at trial, it can show an absence of

2  issue of material fact in two ways: (1) by producing evidence negating an essential

3  element of the nonmoving party's case, or, (2) showing that the nonmoving party lacks

4  evidence of an essential element of its claim or defense. *Nissan Fire & Marine Ins. Co.,*

5  *Ltd., v. Fritz Cos., Inc.*, 210 F.3d 1099, 1106 (9th Cir. 2000).

6      If the moving party meets its burden of production, the burden shifts to the non-

7  moving party to designate specific facts demonstrating the existence of genuine issues for

8  trial. *Celotex*, 477 U.S. at 324.  The "mere existence of a scintilla of evidence in support

9  of the plaintiff's position will be insufficient; there must be evidence on which the jury

10  could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

11  252 (1986).  In determining whether the factfinder could reasonably find in the non-

12  moving party's favor, "the court must draw all reasonable inferences in favor of the

13  nonmoving party, and it may not make credibility determinations or weigh the evidence."

14  *Reeves v. Sanderson Plumbing Prods, Inc.*, 530 U.S. 133, 150 (2000).

15      **B.  Adequacy of the Factual Allegations**

16      LTK's first argument for summary judgment is one that is familiar to the court.

17  The gravamen of LTK's argument can be summarized as follows:  AFM alleged in its

18  complaint that LTK negligently recommended changing the grounding system for the

19  Monorail during the 2001/2002 timeframe (Compl. ¶¶ 3.1, 3.3, 4.2).  The evidence

20  produced during discovery, however, demonstrates that this allegation is incorrect.

21  During discovery, the evidence revealed that (1) LTK initially changed in the Monorail's

22  grounding system from a "floating" to a "bonded" or "grounded" system in the

1    1997/1998 timeframe, and (2) when asked to reevaluate the grounding system in the

2    2001/2002 timeframe, LTK recommended maintaining and reconfiguring the already

3    "bonded" grounded system, but declined to recommend changing it back to a "floating"

4    design.  Thus, LTK asserts that because it did not recommend changing the fundamental

5    design of the grounding system in the 2001/2002 timeframe, the allegations contained in

6    AFM's complaint are false, and LTK is entitled to summary judgment.  (*See* Mot. at 14-

7    19.)

8           This is the fourth time that LTK has advanced this argument to the court.  The

9    court rejected the argument the first two times that LTK raised it in the context of

10   discovery motions.  (*See* 5/1/12 Order (Dkt. # 82) at 9-10; 5/25/12 Order (Dkt. # 96) at 9-

11   10.)  LTK raised the argument a third time in a previous motion for summary judgment.

12   (2d SJ Mot. (Dkt. # 80) at 17-21.)  The court opted not to rule on the issue in the context

13   of LTK's previous summary judgment motion because the court disposed of the motion

14   on other grounds.  (6/14/12 Order (Dkt. # 103) at 9-10.)  Now, LTK has raised the issue

15   for a fourth time in its present motion for summary judgment.  To quote Yogi Berra:

16   "It's like déjà vu all over again."  This time, however, the court reaches the issue on

17   summary judgment, and its twice-stated previous conclusion that the argument is not well

18   stated endures.

19          LTK relies primarily on *Cline v. Industrial Maintenance Engineering  &*

20   *Contracting Co.*, 200 F.3d 1223 (9th Cir. 2000).  *Cline*, however, is easily

21   distinguishable.  *Cline* involved a purported class action lawsuit in which the critical

22   issue was whether the subject employee benefit plan qualified as an individual retirement

1     account ("IRA") plan under the Employee Retirement Income Security Act ("ERISA"),

2     29 U.S.C. § 1001, *et seq.  See Cline*, 200 F.3d at 1231.  Plaintiffs alleged in their initial

3     complaint, which was dismissed, that the plan was IRA qualified.  *Id.* at 1228.  Plaintiffs

4     subsequently filed an amended complaint in which they alleged that the plan was not IRA

5     qualified.  *Id.*  In affirming summary judgment, the *Cline* court stated that "[plaintiffs]

6     could not contradict their earlier allegations in an effort to survive summary judgment."

7     *Id.* at 1232.

8         Unlike the plaintiffs in *Cline*, AFM has not contradicted the allegations in its

9     complaint.  It has alleged that the LTK recommended a change to the grounding system

10    for the Blue and Red Trains.  (Compl. ¶ 3.1.)  It has also alleged that "[t]he electrical

11    ground fault responsible for the fire in the Blue Train on May 31, 2004[,] would have

12    been avoided if the electrical grounding system for the Blue Train had not been changed

13    at the direction of LTK . . . ."  (*Id.* ¶ 3.3.)  As both AFM and this court has previously

14    noted, the Ninth Circuit has characterized the salient allegations in AFM's complaint as

15    "alleg[ing] that the fire [on the Monorail] was a result of LTK's negligent design."

16    *Affiliated FM Ins. Co. v. LTK Consulting Servs., Inc.*, 556 F.3d 920, 920 (9th Cir. 2009).

17    The Washington Supreme Court characterized the gravamen of AFM's complaint as

18    "claiming that LTK was negligent in changing the electrical ground system for the Blue

19    and Red Trains."  *Affliated FM Ins. Co. v. LTK Consulting Servs., Inc.*, 243 P.3d 521, 524

20    (Wash. 2010).  Unlike the plaintiffs in *Cline*, AFM has not abandoned this fundamental

21    allegation concerning LTK's negligence nor contradicted it.

22

1       The present dispute is not about the gravamen of AFM's claims concerning LTK's

2 alleged negligence.  Rather, it is all about timing.  In its complaint, AFM alleges that

3 LTK's negligence in recommending a change in the grounding system for the Red and

4 Blue Trains occurred in 2001 or 2002.  (*See* Compl. ¶¶ 3.3, 4.2.)  However, in its

5 December 7, 2011, responses to LTK's interrogatories, AFM stated that during 1997

6 "LTK approved the modification of the train grounding scheme from a 'floating body'

7 design to a 'body grounded to negative rail' design," and this change "represented a

8 fundamental change in the grounding system that affected its function, maintenance and

9 operating procedures, and safety for both staff and passengers."  (3/30/12 Wahtola Decl.

10 Ex. 5 at 2-4.)  AFM's experts have now asserted that LTK was negligent because (1)

11 LTK changed the Monorail's "floating" grounding system to a "grounded" grounding

12 system in 1997 or 1998,[3] and (2) LTK declined to recommend changing the grounding

13 system back to a floating design when it was engaged by the City once again in the

14 2000/2001 timeframe to survey the Monorail's electrical systems.  (*See* AFM Expert

15 Discl. (Dkt. # 58) Ex. 2.)  Thus, during discovery AFM refined its theory of LTK's

16 negligence to acknowledge that (1) LTK apparently initiated the original design change

17 in the Monorail's grounding system in 1997/1998 rather than in 2001/2002, and (2) in

18 2001/2002 LTK refused to recommend changing the grounding system back to a

19 "floating" design despite Mr. Barney's apparent urging at the time.  Although AFM's

20

21     [3] This avenue of liability is foreclosed by the Ninth Circuit's May 22, 2013, decision.
(9th Cir. Mem. Disp. (Dkt. # 137) at 3 ("To the extent Plaintiff claims that the fire was caused by

22 LTK's alleged negligence in changing from a floating to a bonded grounding system in 1998, the
district court correctly concluded that Plaintiff's claim is time-barred.").)

1   allegations have been refined through discovery, AFM has not fundamentally abandoned

2   nor contradicted its essential claim that LTK was negligent with respect to its

3   recommendations concerning the Monorail's grounding system.  Thus, *Cline* is simply

4   not applicable here.

5          In any event, LTK's argument is inconsistent with modern pleading practice.

6   Prior to the modern era of notice pleading, "pleading requirements were strict and

7   variances of proof were not generally tolerated."  *See Health Care & Retirement Corp. of*

8   *Am. v. St. Paul & Marine Ins. Co.*, 621 F. Supp. 155, 162 (S.D. W.Va. 1985).  A

9   complaint under modern rules, however, is required only to put the defendant on notice of

10  a claim showing that the pleader is entitled to relief or to have "facial plausibilty."  Fed.

11  R. Civ. P. 8; *Ashcroft v. Iqbal*, 556 U.S. 662, 672 (2009).  AFM's complaint meets this

12  standard.  Nevertheless, there is no doubt that under modern pleading rules a fact alleged

13  in a complaint "may be a poor measure of what is to follow."  *Health Care*, 621 F. Supp.

14  at 162.  The gravamen of AFM's complaint is that LTK was negligent with regard to its

15  work on the Monorail's grounding system.  (*See generally* Compl.)  The fact that the

16  dates in AFM's complaint are off or that AFM's description of LTK's negligence has

17  been refined through discovery does not render AFM's present position to be an

18  irredeemable contravention of its prior allegations.  This is the very type of refinement to

19  the parties' positions, whether claims or defenses, that one anticipates will occur during

20  discovery, particularly in light of our modern pleading rules.

21         Even prior to the modern era of notice pleading, however, courts did not consider

22  even large discrepancies in dates or timing to be fatal variances between pleading and

ORDER- 14

1    proof.  *See, e.g.*, *United States v. Le Baron*, 71 U.S. 642, 648 (1866) (stating that

2    allegations of time need not be proven with precision, but that a very large departure

3    therefrom is allowable); *Hollweg v. Schaffer Brokerage Co.*, 197 F. 689, 694-95 (6th Cir.

4    1912) (holding that in an action for breach of employment contract alleged to have been

5    made in February and modified in October, there was no fatal variance, although the

6    proof was of a contract made in April and modified in November).  If courts permitted

7    large departures in the timing prior to the era of modern pleading, then certainly such

8    departures generally should be of no moment today.

9         Most importantly, LTK has asserted no prejudice with respect to any discrepancies

10   concerning timing or dates in AFM's complaint (*see generally* Mot. at 14-19), nor can it.

11   LTK has been aware of AFM's refined theory of liability since at least December 2011,

12   when AFM responded to LTK's interrogatories.  (*See* 3/30/12 Wahtola Decl. ¶ 22, 25-26,

13   Exs. 3, 5.)  Thus, LTK has had ample opportunity to prepare with respect to AFM's

14   claims, including a period of time when discovery was reopened following remand from

15   the Ninth Circuit Court of Appeals.  (*See* Dkt. ## 150, 153, 167.)

16        Finally, in response to LTK's motion, AFM presents an August 25, 2001, draft

17   report, prepared by LTK's engineers, which provides some evidence that LTK did

18   recommend a change in the Monorail's grounding system in the 2001/2002 timeframe.

19   The draft report states, in part:

20        It is not entirely clear what the original intent was for the grounding system,
         but the current system is close to industry standard for vehicle grounding
         systems.   There is a safety ground system which connects electrical
21        equipment to the vehicle frame . . . .  The high voltage and low voltage
         negative returns are floating, except for an intentional jumper between the

safety ground and the high voltage negative return . . . . This system should be improved on by replacing the present wire labeling; removing any unintended connections between safety ground, low voltage negative return, and high voltage negative return; and installing missing cables, particularly on the blue train. The original low voltage negative returns were labeled "LG" for low ground, and the high voltage negative returns were labeled "HG" for high ground. The LG cables were tied to the frame of the vehicle at many points. When the low voltage system was replaced, much of the LG wiring was left in place, and is now acting as the safety ground, bonding equipment to the frame of the vehicle. These cables should now be relabeled "SG" for safety ground. The high voltage negative return should be relabeled "HV-", [sic] and the low voltage negative return should be relabeled "LV-" [sic]. The safety ground, low voltage negative return, and the high voltage negative return should be bonded together at one location at the high voltage auxiliary panel.

(Pierson Decl. (Dkt. # 189) ¶ 3, Ex. A at ¶ 2.1).) AFM is correct that this evidence is sufficient to raise an issue of fact concerning whether LTK recommended a change to the Monorail's grounding system in 2001/2002 timeframe (*see* Resp. at 12-13) as alleged in AFM's complaint (*see* Compl. ¶¶ 3.1, 3.3, 4.2).[4] This is so even though the final report

---

[4] LTK responds to the draft report by asserting that AFM fails to lay a proper foundation for it, and it is therefore not competent evidence that the court can consider on summary judgment. (Reply (Dkt. # 192) at 6-7.) In order to properly support or oppose summary judgment, the party relying on the affidavits and records must lay a proper foundation. *See Beyene v. Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1182 (9th Cir. 1988). "[W]hether the authentication requirement should be applied to bar evidence when its authenticity is not actually disputed, however, is questionable." *Burch v. Regents of Univ. of Cal.*, 433 F. Supp. 2d 1110, 1120 (E.D. Cal. 2006). The document submitted by AFM was produced in discovery by LTK. (*See* Pierson Decl. Ex. A (denoting LTK production numbers at the bottom of each page of the draft report).) AFM has proffered that it is a draft report created by LTK's engineers in 2001. (*Id.* ¶ 3; Resp. at 13.) LTK does not deny these facts in its reply memorandum, but objects only on grounds that AFM's counsel did not lay a proper foundation for the draft report in his declaration. (Reply at 6 (citing *Cal. Pac. Bank c. Small Business Admin.*, 557 F.2d 218, 222 (9th Cir. 1977); *United States v. Dribble*, 429 F.2d 598, 602 (9th Cir. 1970)).) The Ninth Circuit has emphasized that "[a]t the summary judgment stage, we do not focus on the admissibility of the evidence's form[, but rather] on the admissibility of its contents." *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003). Further, "courts generally are much more lenient with the affidavits of a party opposing a summary judgment motion." *Scharf v. United States Att'y General*, 597

1    indicated that the Monorail grounding system was "grounded" or "bonded" in 2001.  (*See*

2    Reply at 6-9, n.3 (citing 3/30/12 Wahtola Decl. Ex. 1 (attaching Collins Dep. at 87:21-

3    97:21).)  The fact that the final report may contain different or contrary conclusions from

4    the draft report does not abnegate the issue of fact created thereby.  For all of the

5    foregoing reasons, the court denies LTK's motion for summary judgment on grounds that

6    AFM's evidence does not conform to the factual allegations in its complaint.

7    **C.  Statute of Limitations**

8    LTK's second ground for summary judgment is also a variation on LTK's prior

9    argument that AFM's claim is barred by the statute of limitations.  (*Compare* Mot. at 19-

10   21 *with* 5/1/12 SJ Mot. (Dkt. # 80) at 21-24.)  On June 14, 2012, the court granted LTK's

11   motion for summary judgment with respect to the statute of limitations.  (*See generally*

12   6/14/12 Order (Dkt. # 102).)  The court found that Mr. Barney knew all the salient facts

13   necessary for SMS to assert a claim against LTK based on LTK's alleged negligent

14   redesign of the Monorail by at least July 15, 2002.  (*Id.* at 13.)  Specifically, the court

15

16   F.2d 1240, 1243 (9th Cir. 1979).  Because the report at issue was apparently drafted by LTK, a
     party to this suit, it is susceptible to authentication and admission at trial.  *See id.* (evidence

17   which could be made admissible at trial may be considered on summary judgment); *see also
     Aholelei v. Hawaii Dep't of Public Safety*, 220 Fed. App'x 670, 672 (9th Cir. 2007); *Anselmo v.*

18   *Mull*, No. 2:12–01422 WBS EFB, 2013 WL 5817560, at *4 (E.D. Cal. Oct. 29, 2013) ("Even if
     the non-moving party's evidence is presented in a form that is currently inadmissible, such

19   evidence may be evaluated on a motion for summary judgment so long as the moving party's
     objections could be cured at trial.").  Because LTK is the source of the draft report, if there were

20   a valid basis for contesting its authenticity, LTK could and presumably would have unearthed it
     and presented it to the court.  LTK has not done so.  *See Fenje v. Feld*, 301 F. Supp.2d 781, 789

21   (N.D. Ill. 2003) ("Even if a party fails to authenticate a document properly or to lay a proper
     foundation, the opposing party is not acting in good faith in raising such an objection if the party

22   nevertheless knows that the document is authentic.").  Accordingly, the court considers the draft
     report with respect to LTK's motion for summary judgment.

1  found that Mr. Barney knew that SMS technicians and Monorail passengers were

2  receiving electrical shocks and electrical arcing was burning holes thought the bodies of

3  Monorail cars.  (*Id.*)  The court concluded that, because SMS knew that it had been

4  injured as a result of LTK's alleged negligent redesign of the Monorail's grounding

5  system as of the above date, the statute of limitations on the cause of action against LTK

6  began to run on that date.  (*Id* at 17.)  Because AFM, as SMS's subrogee, had not filed

7  suit until more than three years after July 15, 2002, the court ruled that AFM's action was

8  time barred.  (*Id.*)

9        The Ninth Circuit reversed.  The Ninth Circuit held that "[t]o the extent that

10  [AFM] claims that the fire was caused by LTK's alleged negligence in changing from a

11  floating to a bonded grounding system in 1998, the district court correctly concluded that

12  [AFM's] claim is time-barred."  (9th Cir. Mem. Disp. at 3.)  The Ninth Circuit noted,

13  however, that AFM's theory, at least in part, was that negligence occurred in the design

14  and installation of the terminal board in 2001 and 2002 and that the redesign of the

15  terminal board was the proximate cause of the 2004 fire.  (*Id.*)  LTK argued that at least

16  one of the series of electrical events referenced above occurred after the terminal board

17  installation and was sufficient to start to the limitations period running.  (*Id.*)  However,

18  the Ninth Circuit held:

19        The record is unclear about the extent, significance, and cause of the
          alleged of the alleged post-installation incidents and, indeed, whether they
20        actually occurred post-installation.  Conflicting inferences may be drawn
          from the monorail manager's correspondence and testimony about the
21        events. . . . Given the disputed facts, and drawing inferences in favor of
          [AFM], we conclude that genuine issues of material fact exist precluding
22        summary judgment.

(*Id.* at 4.)

This time around, following remand from the Ninth Circuit, LTK argues that the statute of limitations began to run on October 30, 2002, when SMS paid thousands of dollars to reimburse the City of Seattle for LTK's electrical engineering services related to the Monorail grounding system that SMS deemed to have been improperly and negligently performed.  (Mot. at 20.)  LTK argues that "this payment constitutes actual and appreciable harm on the part of SMS thereby resolving the only question of fact identified by the Ninth Circuit in its Memorandum."  (*Id.* at 20-21.)  Because AFM did not file suit until more than three years after October 30, 2002, LTK once again asserts that AFM's suit is barred by the statute of limitations.[5] (*See id.* at 21.)

In Washington, the discovery rule states that the statute of limitations starts to run on a negligence claim when the plaintiff discovers, or in the exercise of reasonable diligence should have discovered, facts giving rise to the cause of action.  *See Hipple v. McFadden*, 255 P.3d 730, 735 (Wash. Ct. App. 2011) (citing *Peters v. Simmons*, 552 P.2d 1053, 1056 (Wash. 1976)); *1000 Va. Ltd. P'ship*, 146 P.3d at 428 (stating that under the "discovery rule of accrual, . . . a cause of action accrues when the plaintiff discovers, or in the reasonable exercise of diligence should discover, the elements of a cause of action.").  LTK fundamentally misapprehends that nature of the harm that SMS must

---

[5] In Washington, a three-year statute of limitations governs claims of negligence.  *See Wash. v. Boeing Co*., 19 P.3d 1041, 1050 (Wash. Ct. App. 2000) (stating that negligence claims are subject to the three-year limitations period in RCW 4.16.080).  "Statutes of limitations do not begin to run until a cause of action accrues."  *1000 Va. Ltd. P'ship*, 146 P.3d at 428 (citing RCW 4.16.005.)

1  have discovered in order to initiate the running of the limitations period.  In the context of

2  this case, the Washington Supreme Court has stated that "[a]n injury is remediable in tort

3  if it traces back to the breach of a tort duty arising independently of the terms of the

4  contract."  *Affiliated FM Ins. Co. v. LTK Consulting Servs., Inc.*, 243 P.3d 521, 526

5  (Wash. 2010) (quoting *Eastwood v. Horse Harbor Found.*, 241 P.3d 1256, 1262 (Wash.

6  2010)).  Payment of the contract price to the City of Seattle did not put SMS on notice of

7  its cause of action in negligence against LTK in such a manner as to start the limitations

8  period running.  Although, as LTK argues, this expenditure may count as part of AFM's

9  alleged damages, the simple act of paying LTK's contract price would not lead Mr.

10  Barney to discover SMS's negligence claim against LTK so as to initiate the limitations

11  period.

12         Instead, it was SMS's alleged continuing problems with the electrical and/or

13  grounding systems of the Monorail about which Mr. Barney complains at length in the

14  course of his July 15, 2002, letter that arguably placed SMS on notice of its claim.  (*See*

15  Wahtola Decl. (Dkt. # 173) Ex. A at 100.)  Those issues included "mild electrical shocks

16  to staff and passengers, and electrical arcing and burning of the train car bodies."  (*Id.*)

17  The Ninth Circuit, however, has already ruled that "[t]he record is unclear about the

18  extent, significance, and cause of the alleged post-[terminal board]-installation incidents

19  and, indeed whether they actually occurred post-installation."  (9th Cir. Mem. Disp. at 4.)

20  Because the Ninth Circuit has concluded that "[c]onflicting inferences may be drawn

21  from the monorail manager's correspondence and testimony about the events" (*id.*), the

22  court must deny LTK's second motion for summary judgment based on expiration of the

statute of limitations.  At its core, LTK's second motion for summary judgment based on the statute of limitations is nothing more than a poor rehash of its first motion.  The Ninth Circuit has firmly rejected the notion that this issue can be resolved on summary judgment.  (*See id.*)  Thus, LTK's statute of limitations defense remains an issue for the jury to decide at trial.

### D.  Mitigation of Damages and Assumption of Risk

LTK asserts that it is entitled to summary judgment because SMS failed to mitigate its damages and assumed the risk of the Monorail's bonded grounding system. (Mot. at 21-24.)

The doctrine of mitigation of damages, or avoidable consequences, prevents an injured party from recovering damages that the injured party could have avoided if it had taken reasonable efforts after the wrong was committed.  *Transalta Centralia Generation LLC v. Sicklesteel Cranes, Inc.*, 142 P.3d 209, 212 (Wash. Ct. App. 2006); *see Young v. Whidbey Island Bd. of Realtors*, 638 P.2d 1235, 1238 (Wash. 1982).  A person who has been injured by another's wrongdoing is given wide latitude and is only required to act reasonably in mitigating his or her damages.  *Hoglund v. Klein*, 298 P.2d 1099, 1102 (Wash. 1956); *Tranalta Centralia*, 142 P.3d at 212.  Thus, whether a party properly mitigates his or her damages turns on a determination of reasonableness, and an issue about which reasonable minds could differ is a question for the jury.  *Id.*

In Washington, the doctrine of assumption of risk has four facets:  (1) express assumption of risk, (2) implied primary assumption of risk, (3) implied reasonable assumption of risk, and (4) implied unreasonable assumption of risk.  *Tincani v. Inland*

1   *Empire Zoological Soc'y*, 875 P.2d 621, 633 (Wash. 1994).  The third and fourth aspects

2   of assumption of risk are simply alternative names for contributory negligence, *Scott v.*

3   *Pacific West Mountain Resort*, 834 P.2d 6, 13 (Wash. 1992), and LTK has placed neither

4   at issue in the present motion (*see generally* Mot. at 21-24).  Neither has LTK asserted

5   that SMS expressly assumed the risk of LTK's work with respect to the Monorail's

6   bonded grounding system.  (*Id.*)  Instead, LTK asserts that it is entitled to summary

7   judgment with respect to AFM's claims under implied primary assumption of risk.  (Mot.

8   at 22 ("Of particular importance to the present case, 'Implied primary assumption of risk

9   is a complete bar to recovery. . . .'") (quoting *Gregoire v. City of Oak Harbor*, 244 P.3d

10  924, 928 (Wash. 2010).)  Both express and implied assumption of risk raise the same

11  question:  Did the plaintiff consent, before the accident or injury, to the negation of a duty

12  that the defendant would otherwise have owed to the plaintiff?  *Home v. N. Kitsap Sch.*

13  *Dist.*, 965 P.2d 1112, 1118 (Wash. Ct. App. 1998).  If the answer is yes, "the defendant

14  does not have a duty, there can be no breach and hence no negligence."  *Id.* (quoting

15  *Scott*, 834 P.2d at 13).

16          Because implied primary assumption of risk is a complete bar to recovery, courts

17  construe the doctrine narrowly.  *Lascheid v. City of Kennewick*, 154 P.3d 307, 310

18  (Wash. Ct. App. 2008).  To invoke the doctrine, LTK must show that SMS "knowingly

19  and voluntarily chose to encounter the risk."  *Home*, 965 P.2d at 1119.  The evidence

20  must show that SMS (1) had full subjective understanding (2) of the presence and nature

21  of the specific risk, and (3) voluntarily chose to encounter it.  *Id.*  Whether a plaintiff

22  decides knowingly to encounter a risk turns on whether the plaintiff, at the time of

decision, actually and subjectively knew all facts that a reasonable person in the defendant's shoes would know and disclose, or concomitantly, all facts that a reasonable person in the plaintiff's shoes would want to know and consider. *Id.* Knowledge and voluntariness are questions of fact for the jury, except when reasonable minds could not differ. *Id.*; *Wirtz v. Gillogly*, 216 P.3d 416, 420 (Wash. Ct. App. 2009).

LTK argues that despite SMS's stated concerns about LTK's engineering with respect to the Monorail's grounding system and continued electrical arcing in the system, SMS continued to operate and maintain the Monorail with a bonded grounding system in place and even reimbursed the City of Seattle for LTK's work. (*See* Mot. at 24.) Thus, according to LTK, SMS (and therefore also AFM as SMS's subrogee) knew of the dangers that were purportedly inherent in LTK's work, but nevertheless assumed those risks or failed to mitigate its damages by continuing to operate the system. (*Id.*)

Here, however, there is evidence that in the face of SMS's doubts about LTK's engineering regarding the Monorail's grounding system, LTK issued assurances of safety to SMS. For example in an email August 27, 2002, Mr. Barney stated:

> . . . [E]lectrical engineers from . . .LTK . . . have confirmed that the existing grounding systems, for both the trains and the traction power system, meet all necessary safety requirements.

> **\*\*\*\*\*\*\*\*\*\***

> . . . [E]lectrical engineers from . . . LTK . . . have confirmed that the protection devices built into the train grounding system, and the traction power supply system, will protect passengers from any injury resulting from electrical shock. We have been assured by these engineers that mild shocks to passengers is normal, and presents no danger.

(3/3/14 Pierson Decl. (Dkt. # 189) Ex. E.)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

These reassurances from LTK regarding the safety of the grounding system in the face of SMS's doubts raise an issue of fact both with respect to LTK's defense of mitigation of damages as well as assumption of risk.  Whether it was reasonable for SMS to rely on these assurances of safety from LTK engineers and move forward with payment to the City of Seattle for LTK's services and continued operation of the Monorail or whether based on its own apparent substantial doubts SMS should have refused to pay the City of Seattle for LTK's services or taken other actions to mitigate its damages is an issue of fact reserved for the jury.  Likewise, whether SMS was entitled to surrender its judgment concerning the danger related to the Monorail's bonded grounding system based on LTK's assurances of safety, thereby negating any assumption of risk defense, raises an issue of fact about which reasonable minds could differ.  *See, e..g*, *Jones v. Baker*, 35 P.2d 1103, 1105 (Wash. 1934) ("Where . . . the master has assured the servant that the place is safe, or has directed the specific thing to be done in such a manner as to imply an assurance, the servant will not be held to have assumed the risk."); *Fred Harvey Corp. v . Mateas*, 170 F.2d 612, 616 (9th Cir. 1948) (stating that if the plaintiff surrenders his better judgment upon an assurance of safety or a promise of protection, he does not assume the risk, unless the danger is so obvious and so extreme that there can be no reasonable reliance upon the assurance); *Garcia v. Estate of Tom Norton*, 228 Cal Rptr. 108, 113 (Cal. Ct. App. 1986) ("Where an injured party has surrendered his better judgment upon an assurance of safety by one who owes him a duty of care, he does not assume the risk of participating in an activity unless the danger is so

ORDER- 24

1    obvious and so extreme that there can be no reasonable reliance upon the assurance.").

2    Accordingly, the court denies LTK's motion for summary judgment based on its defenses

3    of failure to mitigate damages and assumption of risk.  These issues remain for the jury at

4    trial.

5                            **IV.    CONCLUSION**

6          Based on the foregoing, the court DENIES LTK's motion for summary judgment

7    (Dkt. # 172), and this matter will proceed to trial.

8          Dated this 16th day of April, 2014.

9

10

11                                          _____

12                                          JAMES L. ROBART
                                            United States District Judge

13

14

15

16

17

18

19

20

21

22

ORDER- 25